STATE OF CONNECTICUT *v.* DANIEL J. OUELLETTE
(SC 18273)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued January 7—officially released March 16, 2010

*Richard A. Reeve*, special public defender, with whom, on the brief, was *Michael O. Sheehan*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Daniel J. Ouellette, appeals, following our grant of his petition for certification; *State* v. *Ouellette*, 289 Conn. 951, 961 A.2d 417 (2008); from the judgment of the Appellate Court affirming the trial court's judgments of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (3), larceny in the second degree in violation of General Statutes § 53a-123 (a) (3), conspiracy to commit larceny in the second degree in violation of §§ 53a-48 and 53a-123 (a) (3), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), larceny in the fifth degree in violation of General Statutes § 53a-125a,[1] and conspiracy to commit larceny in the fifth degree in violation of §§ 53a-48 and 53a-125a. *State* v. *Ouellette*, 110 Conn. App. 401, 955 A.2d 582 (2008). The sole issue before us is whether the Appellate Court properly concluded that the record did not support the defendant's claim that he had been

---

[1] We note that § 53a-125a recently was amended to require the value of the stolen property to exceed $500, increased from the previously required $250. See Public Acts 2009, No. 09-138, § 5, codified at General Statutes (Sup. 2010) § 53a-125a. For purposes of convenience, we refer to the 2009 codification of the statute, which provision is identical to the one in effect at the time of the offense in the present case.

deprived of a fair trial due to the state's alleged withholding of impeachment evidence relating to the nature of its plea agreement with the defendant's accomplice.[2] We affirm the Appellate Court's judgment.

The opinion of the Appellate Court sets forth the following facts, which the jury reasonably could have found. "On August 14, 2004, the victim, Carmela Interligi, was loading groceries into her car when she was approached by Pamela Levesque. Levesque produced a knife and demanded the victim's purse. Although the victim resisted and suffered two cuts to her fingers, Levesque was able to reach inside the purse and remove the victim's wallet. Levesque then fled to a nearby 1986 Chevrolet Monte Carlo, which was being operated by the defendant. She and the defendant then left the scene by car.

"Shortly after the robbery, the defendant drove to the Wal-Mart store on Farmington Avenue in Bristol. Casey Keil, a loss prevention associate at Wal-Mart, observed the defendant stop in front of the store and Levesque exit the car and place a single credit card into her rear pocket. This conduct aroused Keil's suspicions, and he followed her into the store, where she proceeded directly to the photography department and quickly chose a Sony camcorder. As Keil was observing Levesque, another Wal-Mart employee alerted him that the defendant had entered the store. Keil observed the defendant covertly watching Levesque purchase the camcorder, and, as Levesque completed the transaction, Keil observed the defendant heading toward the store's exit.

"Keil went to the cash register and compared the signature on the credit card slip with the name of the

---

[2] For reasons that we explain subsequently in this opinion, after reviewing the record and briefs, we have rephrased the statement of the certified issue to reflect more precisely the issue before us. See *Ankerman* v. *Mancuso*, 271 Conn. 772, 777, 860 A.2d 244 (2004).

cardholder and, finding that they did not match, stopped Levesque to inquire further. Levesque stated that the credit card belonged to a relative. Keil escorted her to a back office, and another associate determined that the credit card was stolen.

"Keil then went outside and located the defendant in a parked car, with the engine running. Upon Keil's request, the defendant accompanied Keil back into the store, where the Bristol police department was summoned. The victim thereafter identified Levesque as the person responsible for stealing her wallet and assaulting her. The police discovered the victim's wallet in the car that the defendant was operating." Id., 403–405.

The record also reveals the following additional undisputed facts and procedural history. Levesque was arrested and pleaded guilty to one charge of robbery in the first degree. At the plea hearing, the trial court granted the state's request to delay her sentencing until after the defendant's trial, at which it was expected that Levesque would testify as a state's witness. The state also represented that it would recommend at Levesque's sentencing that she receive a sentence of twenty years incarceration, execution suspended after ten years, followed by five years probation.

At the defendant's trial, Levesque testified extensively as to the defendant's role in the incident. Specifically, she testified that: it had been the defendant's idea to "rob an old lady"; she and the defendant had discussed the plan before the incident; the defendant had given her a knife to use to threaten the victim; the defendant had used the victim's credit card to purchase gas; and the defendant had driven to Wal-Mart in order for Levesque to purchase a camcorder with the victim's credit card. Levesque also acknowledged on direct examination that she had entered into a plea agreement under which, in exchange for her truthful testimony,

the state would recommend a sentence of twenty years imprisonment, execution suspended after ten years, with five years probation, and would inform the sentencing court of her cooperation. Under the agreement, Levesque also retained the right to argue for a lesser sentence.[3] The defendant revisited the plea agreement on cross-examination, during which Levesque admitted that she believed "it would lessen [her] sentence if there were somebody else responsible" and acknowledged that, if she had been the sole perpetrator, she would

---

[3] The relevant portion of the trial transcript provides the following colloquy between the state's attorney and Levesque:

"Q. Okay. And at the time of the plea, do you remember the prosecutor telling the judge that at the time of sentencing the state of Connecticut would recommend that you would receive a sentence of twenty years suspended after ten years of incarceration followed by five years of probation. Do you remember that?

"A. Yes, I do.

"Q And your attorney was given the right to argue for a lesser sentence. Is that your understanding?

"A. Yes.

"Q. And that it would be up to the judge to decide what the punishment would be. Is that correct?

"A. Yes.

"Q. But you understood that the state was going to ask that there be ten years incarceration for you, that when you get out you would be on probation for an additional five years. Is that your understanding?

"A. Yes.

"Q. And do you remember also being told by either your attorney or the prosecutor or both together that if you agree to testify truthfully in the case of [the defendant] that that information would be provided to the judge at the time of the sentencing. Is that your understanding?

"A. Yes.

"Q. But did you also understand that the state was making no promises or the judge was making no promises as to what your ultimate sentence would be. Is that your understanding?

"A. Yes it is.

"Q. So you understand that the judge would have the right to sentence you to as much as twenty years suspended after ten years of incarceration and five years probation when you are sentenced in this matter?

"A. Yes, I do.

"Q. And is there any other promises that have been made to you?

"A. No."

not have had the opportunity to testify against anyone else. During closing argument, the state reiterated that it was "going to recommend that [Levesque] receive a sentence of ten years to serve followed by five years probation." The jury found the defendant guilty on all counts, and he subsequently was sentenced to a twenty year term of imprisonment, execution suspended after fourteen years, with five years of probation.

At Levesque's sentencing hearing, the state set forth the facts of the case and several aggravating factors, including the advanced age of the victim, Levesque's use of a knife in the incident, and Levesque's role in planning and executing the robbery. The state's attorney then informed the court of Levesque's cooperation[4] in testifying against the defendant and concluded: "I'd ask Your Honor to consider a sentence, taking into account all of these factors, the serious nature of the crime, the fact that an older person was the victim of the crime, and also that [Levesque] pled guilty and also cooperated and testified, as I said, truthfully and candidly in the course of the trial of the [defendant]. I indicated that the cap was twenty years . . . suspended after ten [years] with five years probation. I would leave it up to Your Honor as to what you feel the appropriate sentence [is], given all the relevant factors." The court sentenced Levesque to twelve years imprisonment, execution suspended after three years, with four years probation.

---

[4] Regarding Levesque's cooperation, the state's attorney noted: "Since the time of the arrest, [Levesque], Your Honor, did plead guilty, which I think is an admission of wrongdoing and, obviously, to her credit, and she also did testify at the trial of [the defendant]. She gave testimony that I believed to be truthful testimony and I think the jury, based on their verdict of guilty on all charges, also found the testimony . . . to be truthful and credible.

"And while the state had other evidence implicating [the defendant], obviously the testimony of [Levesque] was very important to the state in gaining the conviction of the second person involved in this, [the defendant]."

After Levesque's sentencing, the defendant appealed from the judgment of conviction to the Appellate Court claiming, inter alia, that he had been deprived of his constitutional rights to due process and to a fair trial because the state had withheld impeachment evidence concerning the true nature of the plea agreement between the state and Levesque. *State* v. *Ouellette*, supra, 110 Conn. App. 407. Specifically, the defendant claimed that the discrepancy[5] between the representations of the plea agreement at the defendant's trial— that the state was going to *recommend* that Levesque be sentenced to twenty years incarceration, execution suspended after ten years, followed by five years probation—and the state's failure to *actually recommend* that sentence at Levesque's sentencing reflected an implicit understanding between Levesque and the state that if she testified favorably, the state would *not* make any such recommendation. Id., 410; see *State* v. *Ouellette*, Conn. Appellate Court Records & Briefs, April–May Term, 2008, Defendant's Brief, pp. 13–14. Acknowledging that he previously had not raised this claim, the defendant sought review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6] *State* v. *Ouellette*, supra, 409.

---

[5] There was no discrepancy with regard to the state's representations about Levesque's testimony or her right to argue for a lesser sentence; that is, the defendant's jury and the court at Levesque's sentencing heard exactly the same representations as to those aspects of her plea agreement.

[6] "Under [*State* v. *Golding*, supra, 213 Conn. 239–40], a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Brewer*, 283 Conn. 352, 358, 927 A.2d 825 (2007).

The defendant subsequently filed a motion for rectification and enlargement of the trial record to develop the record for his appeal. Specifically, the defendant requested that the trial court: (1) include transcripts from Levesque's plea and sentencing proceedings; and (2) conduct an evidentiary hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 756 A.2d 799 (2000) (*Floyd* hearing), to solicit testimony and evidence relevant to whether the state knowingly had presented misleading testimony or suppressed impeachment evidence regarding its plea arrangement with Levesque.[7] The trial court granted the motion as to the transcripts, but denied it as to the *Floyd* hearing.

The defendant then filed a motion for review in the Appellate Court of the trial court's decision denying the *Floyd* hearing. The Appellate Court granted review, but denied the relief requested. Thereafter, in a separate proceeding, the Appellate Court affirmed the defendant's judgments of conviction. *State* v. *Ouellette*, supra, 110 Conn. App. 403. With respect to his claim relating to Levesque's plea agreement, although the Appellate Court expressed serious concern "that the state [had] represented in very definite terms that it was going to make a sentence recommendation but then only relayed that recommendation to Levesque's sentencing court by referring to the cap of twenty years suspended after ten"; id., 410; it concluded that there was insufficient

---

[7] Pursuant to *State* v. *Floyd*, supra, 253 Conn. 700, a trial court may conduct a posttrial evidentiary hearing to explore claims of potential *Brady* violations; see *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); when "a defendant was precluded from perfecting the record due to new information obtained after judgment." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 712–13 n.17, 911 A.2d 1055 (2006). In order to warrant such a hearing, a defendant must produce "prima facie evidence, direct or circumstantial, of a *Brady* violation unascertainable at trial." Id. "The trial court's decision with respect to whether to hold a *Floyd* hearing is reviewable by motion for review pursuant to Practice Book § 66-7 . . . ." Id.

evidence in the record to conclude that the state improperly had withheld exculpatory information from the defendant. Id., 411. Accordingly, the Appellate Court concluded that the defendant's claim failed under the third prong of *Golding*. Id., 410; see footnote 6 of this opinion.

We thereafter granted the defendant's petition for certification to appeal limited to the following question: "In circumstances where the prosecutor adduced evidence that the state had entered into a plea agreement with its key witness pursuant to which the state would seek a particular sentence but then, after that witness' trial testimony, the state recommended a different, more lenient sentence for the witness, did the Appellate Court improperly refuse to remand the case to the trial court for an evidentiary hearing on the issue of whether the state's conduct violated the defendant's due process rights?" *State* v. *Ouellette*, supra, 289 Conn. 951–52. Upon review of the record and the claims raised before the Appellate Court, we now conclude that the certified question is not an adequate statement of the issue properly before this court. Specifically, although the defendant claimed within the context of his motion for review that the Appellate Court should order a *Floyd* hearing to determine *whether* the state had withheld impeachment evidence relating to the actual nature of its plea agreement with Levesque in violation of his right to due process, in his appeal to that court, he represented that the record *as it existed* was sufficient to establish that due process violation. See *State* v. *Ouellette*, supra, 110 Conn. App. 409; compare *State* v. *Hamlin*, 90 Conn. App. 445, 452, 878 A.2d 374 (court reviewed request for *Floyd* hearing when defendant requested *Golding* review of claim and *requested in alternative* that Appellate Court remand matter for *Floyd* hearing), appeal denied, 276 Conn. 914, 888 A.2d 86 (2005). The defendant cannot resurrect his claim, denied by the trial court and disposed of by the Appellate Court not in his appeal but in a separate proceeding, that a *Floyd* hearing was

necessary merely by taking a certified appeal to this court.[8] See *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005) ("a claim that has been abandoned during the initial appeal to the Appellate Court cannot subsequently be resurrected by the taking of a certified appeal to this court"), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

Accordingly, we must reformulate the certified question to conform to the issue actually presented to and decided in the appeal to the Appellate Court. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 191, 884 A.2d 981 (2005) (court may reframe certified question to more accurately reflect issues presented); *Ankerman* v. *Mancuso*, 271 Conn. 772, 777, 860 A.2d 244 (2004) (court may rephrase certified questions in order to render them more accurate in framing issues that case presents); *State* v. *Brown*, 242 Conn. 389, 400, 699 A.2d 943 (1997) (court may reframe certified question to eliminate focus on improper issue); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 648 n.1, 674 A.2d 821 (1996) (court may reframe certified question to more accurately reflect issues pre-

---

[8] The defendant claims that he has not abandoned this claim because the Appellate Court could have reviewed, sua sponte, the denial of the motion for review if "plenary review of the case on the merits of the appeal disclose[d] that [the] earlier decision was ill considered, and that further articulation [was] necessary for the just determination of the appeal." (Internal quotation marks omitted.) *McClintock* v. *Rivard*, 219 Conn. 417, 425, 593 A.2d 1375 (1991). The defendant misapprehends the meaning of the narrow exception set forth in *McClintock*, which merely allows an appellate court, upon the motion of a party, to revisit a motion for review that it has denied when *both* the underlying appeal and the motion for review are properly before that court. Id., 424–25. The defendant's misunderstanding has no impact on the scope of *this court's* review of the Appellate Court decision in this case; *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007) ("[I]n a certified appeal, the focus of our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo." [Internal quotation marks omitted.]); because the merits of the motion for review of the trial court's decision denying the defendant's request for a *Floyd* hearing have never been properly before this court.

sented). We therefore consider whether the Appellate Court properly concluded that the record did not establish that the state improperly had withheld impeachment evidence regarding Levesque's credibility.

We first set forth our law concerning the suppression of impeachment evidence. "The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms*, 201 Conn. 395, 405 & n.8, 518 A.2d 35 (1986). In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . . *State* v. *Correa*, 241 Conn. 322, 360–61, 696 A.2d 944 (1997).

"It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused. . . . *State* v. *McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989); see also *State* v. *White*, 229 Conn. 125, 135, 640 A.2d 572 (1994). . . . *State* v. *McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997); see also *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*. *State* v. *McIntyre*, supra, 323." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 253 Conn. 736–37.

The Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed.

2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). See *Jenkins* v. *Artuz*, 294 F.3d 284, 292–93 (2d Cir. 2002) (discussing application of *Napue* and *Brady* to undisclosed plea agreement). Drawing from these cases, this court has stated: "[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue* v. *Illinois*, supra, 269. If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. *Giglio* v. *United States*, supra [153]; *Napue* v. *Illinois*, supra, 269–70. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. *United States* v. *Harris*, 498 F.2d 1164, 1169 (3d Cir.), cert. denied sub nom. *Young* v. *United States*, 419 U.S. 1069, 95 S. Ct. 655, 42 L. Ed. 2d 665 (1974). A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. *Napue* [v. *Illinois*], supra, 271. *Giglio* v. *United States*, supra, 154; see *United States* v. *Bagley*, [supra, 473 U.S. 678–80]." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 560–61, 710 A.2d 1348 (1998).

The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. See *State* v. *Floyd*, supra, 253 Conn. 737 ("[w]e first consider whether there was an undisclosed, implied plea agreement between [the witness] and the state"); *State* v. *Satchwell*, supra, 244 Conn. 561 ("[t]he defendant, however, has failed to establish the necessary factual predicate to his claim, namely, that the state's attorney did, in fact, promise

to dismiss the aiding and abetting arson murder charges against [the witness] as part of the plea agreement between [the witness] and the state"). Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error. See *State* v. *Floyd*, supra, 737; *State* v. *Satchwell*, supra, 561. In the present case, however, because the trial court made no such determination, the defendant sought review under *Golding*, and the Appellate Court determined that the record did not support his claim that there was such an agreement. Under *Golding*, we review the Appellate Court's conclusion de novo. *State* v. *Cruz*, 269 Conn. 97, 104, 848 A.2d 445 (2004) ("[w]hether the Appellate Court properly employed *Golding* review presents a question of law over which our review is plenary").

As we previously have noted, Levesque responded affirmatively to extensive questioning about a plea agreement with the state under which the state agreed to recommend a twenty year prison sentence, with ten years to serve, followed by five years of probation, but would inform the sentencing judge about Levesque's cooperation. See footnote 3 of this opinion. This information properly was revealed to the defendant, judge, and jury, and therefore cannot provide a basis for the defendant's claim. The defendant claims, however, that Levesque and the state entered another, undisclosed plea agreement under which the state would *not* recommend the sentence of twenty years imprisonment, execution suspended after ten, followed by five years probation but would merely inform the sentencing court about Levesque's exposure to that sentence. In support of this claim, the defendant points only to the "stark differences" between the state's representations of the plea agreement to the jury at the defendant's trial and its distinct actions at sentencing.

The record only reveals, however, that, at Levesque's sentencing, the state did not recommend imposition of

the maximum sentence, but instead simply noted the maximum sentence Levesque could receive under her plea agreement as well as her cooperation, and left the sentencing to the court's discretion. Although the record reveals this discrepancy, it does not adequately establish why the state's attorney failed to recommend the maximum sentence at the sentencing hearing and is therefore insufficient to determine whether the disparity arose from mere negligence or from the more nefarious root of an undisclosed plea agreement.[9] As

[9] Indeed, it is precisely the necessity of an adequate record in cases that involve allegations of undisclosed agreements between the state and cooperating witnesses, that underscores the importance of *Floyd* hearings. See *State* v. *Ortiz*, 280 Conn. 686, 712–13 n.17, 911 A.2d 1055 (2006). As set forth previously in the text of this opinion, the trial court's denial of the defendant's motion for rectification and enlargement is not properly before us, and, therefore, we do not opine on the propriety of that decision. Nonetheless, we take this opportunity to reiterate that, although "[a] *Floyd* hearing is not a license to engage in a posttrial fishing expedition"; id.; courts should ordinarily grant *Floyd* hearings when a defendant can produce prima facie evidence, direct or circumstantial, of a *Brady* violation unascertainable at trial. Id. Although the existence of an undisclosed agreement is a fact based inquiry for the determination of the trial court; *State* v. *Floyd*, supra, 253 Conn. 737; favorable consideration provided to a witness after testimony for the state may, in some cases, raise the inference of such an agreement. Compare *Ouimette* v. *Moran*, 942 F.2d 1, 6–7 (1st Cir. 1991) (upholding inference of undisclosed deal between witness and prosecution from facts that cooperating witness was never charged with prison escape or sent back to prison following escape, was allowed to plead to original charge and was given parole); *Keating* v. *Missouri*, 643 F.2d 1315, 1317–18 (8th Cir.) (evidence that eight charges against cooperating witness were dropped within minutes of her testimony and that prosecutor contacted out-of-state prosecutor to inquire into dropping charges raised strong inference of undisclosed deal between witness and state), cert. denied, 454 U.S. 846, 102 S. Ct. 163, 70 L. Ed. 2d 133 (1981) and *Commonwealth* v. *Hill*, 432 Mass. 704, 712, 739 N.E.2d 670 (2000) (reduction of charges against witness strongly supported existence of undisclosed agreement), with *Shabazz* v. *Artuz*, 336 F.3d 154, 165 (2d Cir. 2003) (fact that witnesses received favorable treatment from government, standing alone, does not establish existence of undisclosed pretrial agreement) and *United States* v. *Molina*, 75 F.3d 600, 602 (10th Cir.) (posttrial consideration provided to witnesses "not evidence" of undisclosed agreement), cert. denied, 517 U.S. 1249, 116 S. Ct. 2510, 135 L. Ed. 2d 199 (1996).

this court previously has stated, "we will not lightly presume that the state's attorney misrepresented the true nature of the state's agreement with [the witness]." *State* v. *Satchwell*, supra, 244 Conn. 563. Accordingly, we conclude that the Appellate Court properly determined that the record did not establish the existence of an undisclosed agreement or understanding, and that, therefore, the defendant could not prevail under *Golding*. See id. ("In view of the inadequacy of the record, we are unable to determine precisely what facts or circumstances, wholly apart from any agreement with [the witness], may have prompted the state's attorney to dismiss the four charges . . . against [the witness]. Nor will we speculate as to what factors the state's attorney legitimately may have considered in reaching his decision to dismiss those charges. We therefore reject the defendant's claim that the record compels a conclusion that the state's attorney secretly promised [the witness] that he would reduce the charges against her in return for her cooperation against the defendant."); see also *State* v. *Floyd*, supra, 253 Conn. 738–40 (no evidence of implied plea agreement when state did not oppose witness' motion to reduce bond, did not charge witness with violation of probation, and allowed witness to plead guilty to lesser charge); R. Cassidy, " 'Soft Words of Hope:' *Giglio*, Accomplice Witnesses, and the Problem of Implied Inducements," 98 Nw. U. L. Rev. 1129, 1160 n.182 (2004) ("if the only proof of a 'promise, reward or inducement' that the defendant is able to adduce at this hearing is the post-testimony reward to the cooperating witness, the *Giglio* claim generally will be denied").

Despite this conclusion, however, we agree with the Appellate Court that it is disturbing "that the state represented in very definite terms that it was going to make a sentence recommendation but then only relayed that recommendation to Levesque's sentencing court by

referring to the cap of twenty years suspended after ten." *State* v. *Ouellette*, supra, 110 Conn. App. 410. Although the state suggests that any discrepancy between its representations at the defendant's trial and its conduct at Levesque's sentencing hearing was harmless because the jury already knew that Levesque was motivated to testify favorably for the state, we are cognizant of the exhortation of the United States Supreme Court that "it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue* v. *Illinois*, supra, 360 U.S. 269. Only through complete and candid disclosure of a witness' interest can the jury accurately gauge the credibility of the testimony proffered.

The importance of candor is particularly acute when a cooperating witness testifies on behalf of the state, which also wields power over that witness' sentencing. As one court has noted, "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence . . . ." *United States* v. *Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987), cert. denied sub nom. *Nelson* v. *United States*, 484 U.S. 1026, 108 S. Ct. 749, 98 L. Ed. 2d 762 (1988); see also *Williamson* v. *United States*, 512 U.S. 594, 601, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994) ("[d]ue to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence" [internal quotation marks omitted]); *Washington* v. *Texas*, 388 U.S. 14, 22–23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) ("[t]o think that criminals will lie to save their fellows but not to obtain favors from the prosecution for themselves is indeed to clothe the criminal class with more nobility than one might expect to find in the public at large"); *DuBose* v. *Lefevre*, 619 F.2d 973, 979 (2d Cir. 1980) ("[u]nquestionably, agreements . . . to reward testimony by consideration create an

incentive on the witness' part to testify favorably to the [s]tate and the existence of such an understanding is important for purposes of impeachment"). This court has long recognized that "[t]he conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he testifies"; *State* v. *Carey*, 76 Conn. 342, 349, 56 A. 632 (1904); and, accordingly, has required extra precautions to minimize that unreliability. See *State* v. *Patterson*, 276 Conn. 452, 467–68, 886 A.2d 777 (2005) (describing additional jury cautions necessary when accomplice or complaining witness testifies); *State* v. *Colton*, 174 Conn. 135, 140, 384 A.2d 343 (1977) ("inherent unreliability of accomplice testimony ordinarily requires a particular caution to the jury").

Therefore, we urge the state to ensure that sentencing recommendations for cooperating witnesses conform to both the letter and the spirit of any plea agreements disclosed at trial pursuant to *Brady* and *Giglio*. Moreover, in light of the aforementioned concerns, we exercise "our inherent authority to safeguard the administration of justice"; *State* v. *Day*, 233 Conn. 813, 855–56, 661 A.2d 539 (1995), overruled in part on other grounds by *State* v. *Connor*, 292 Conn. 483, 528 n.29, 973 A.2d 627 (2009); to provide guidance to the trial courts relating to this matter. See generally *State* v. *Ledbetter*, 275 Conn. 534, 547, 881 A.2d 290 (2005) (reciting circumstance in which this court has exercised its inherent supervisory authority over administration of justice), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Patterson*, 230 Conn. 385, 397, 645 A.2d 535 (1994) (same), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). When the state attests to a witness' cooperation at that witness' sentencing hearing, we direct the sentencing court to inquire into the nature of any plea agreement between the state and the witness, and any representations con-

cerning that agreement made during the trials at which the witness testified. While this inquiry will not affect the sentencing court's "wide discretion to tailor a just sentence in order to fit a particular defendant and his crimes"; (internal quotation marks omitted) *State* v. *Tabone*, 292 Conn. 417, 437 n.23, 973 A.2d 74 (2009); we intend that it will encourage prosecutors to ensure consistency in their sentencing recommendations and will provide a record of any discrepancies that may nonetheless occur.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.