******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JULIAN MARQUEZ *v.* COMMISSIONER
OF CORRECTION
(AC 38016)

DiPentima, C. J., and Mullins, and Foti, Js.

*Argued October 24, 2016—officially released January 10, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Fuger, J.)

*James E. Mortimer*, with whom, on the brief, was
*Michael D. Day*, for the appellant (petitioner).

*Lisa Herskowitz*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *Angela Macchiarulo*, senior assistant
state's attorney, for the appellee (respondent).

*Opinion*

FOTI, J. The petitioner, Julian Marquez, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, he claims that the habeas court (1) abused its discretion by denying his petition for certification to appeal, and (2) improperly concluded that the alleged conduct of the prosecutor in the underlying criminal proceeding did not violate the petitioner's right to due process and a fair trial. We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal, and, accordingly, dismiss the appeal.

The following facts and procedural history are relevant to our resolution of the petitioner's claims. The petitioner's conviction arises from a home invasion that occurred in the early hours of December 20, 2003, during which the petitioner and an accomplice, Edwin Soler, forced entry into an apartment at gunpoint, robbed four men in the apartment, struggled with and ultimately fatally shot one of the robbery victims, and then fled into the night.[1] Only the petitioner carried a weapon. The robbery victim who was killed, Miguel Delgado, Jr., lived at the apartment, and the other three robbery victims, Christopher Valle, Mark Clement, and Amauri Escobar, were friends visiting Delgado. The petitioner was charged with, and, after a jury trial, ultimately was convicted of, one count of felony murder in violation of General Statutes § 53a-54c, two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and one count of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2).[2] See *State* v. *Marquez*, 291 Conn. 122, 124, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

At the petitioner's criminal trial, the state presented the testimony of the petitioner's codefendant, Soler, as well as the testimony of two of the surviving robbery victims, Valle and Clement.[3] Both Valle and Clement testified that the petitioner was the gunman. Soler testified that the petitioner was the assailant who physically struggled with and fatally shot Delgado. Additionally, Soler testified that, at the sound of the first gunshot, he fled the scene in fear, and then heard a second shot while fleeing. Soler testified that he did not have an agreement with the state to receive any benefit in exchange for his testimony. Rather, Soler explained that he was testifying against the petitioner because "no one was supposed to get hurt." On cross-examination, he testified that he had not been offered a particular plea deal in exchange for his testimony, that he did not know how the charges pending against him would be resolved, and that he was testifying only because it was the "right thing to do."

After Soler testified, the jury was excused, at defense

counsel's request, so that defense counsel could inquire of the state, through the court, whether any benefits had been promised to Soler in exchange for his testimony. The prosecutor then explained that the state had discussed the possibility of reducing Soler's charges but that no promises had been made. Originally, Soler faced the same charges as the petitioner, which included one count of felony murder in violation of § 53a-54c, multiple counts of robbery in the first degree in violation of § 53a-134 (a) (2), and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). Three months after testifying, Soler pleaded guilty to two counts of robbery in the first degree and attempt to commit robbery in the first degree. He was sentenced to a total effective sentence of twenty years incarceration, execution suspended after nine years, followed by five years of probation, despite the state's request for a longer prison sentence.

Following the petitioner's conviction of one count of felony murder, two counts of robbery in the first degree, and one count of attempt to commit robbery in the first degree, the trial court, *Sheldon*, *J.*, sentenced the petitioner on March 10, 2006, to a total effective sentence of fifty years incarceration, execution suspended after thirty-five years, followed by five years of probation. On direct appeal, our Supreme Court affirmed the judgment. *State* v. *Marquez*, supra, 291 Conn. 167.

On December 15, 2014, the petitioner filed the operative petition for a writ of habeas corpus alleging, inter alia, that the state had violated his due process rights and his right to a fair trial by (1) failing to disclose favorable evidence to him in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),[4] and (2) failing to correct Soler's allegedly false testimony that he had not been promised any benefits by the state in exchange for his testimony. At the habeas trial, testimony was presented from, among others, Edward Narus, the senior assistant state's attorney who had prosecuted Soler, and Soler's defense attorney, Margaret P. Levy. Both testified that the state had discussed possible plea deals with Soler, the essence of which was that the state might reduce certain charges in exchange for an agreement for him to testify against the petitioner. This testimony established, however, that discussions of a plea deal never progressed beyond preliminary discussions.

In an oral ruling, the habeas court, *Fuger*, *J.*, denied the petition for a writ of habeas corpus on May 5, 2015. The habeas court expressly based its denial on the "key evidentiary finding" that there was no credible evidence that Soler had a deal with the state to receive a benefit in exchange for his testimony and the state, therefore, did not commit a *Brady* violation by failing to disclose such an agreement when none existed. On May 12, 2015,

the habeas court denied certification to appeal. This appeal followed.

On appeal, the petitioner argues that the habeas court abused its discretion by denying certification to appeal because he presented sufficient evidence to render the issues in this case debatable among jurists of reason. He argues that the evidence presented establishes that the prosecution failed to disclose that Soler had an agreement with the state that the charges against him would be reduced, and that he would face less time in prison, if he cooperated with the state by testifying against the petitioner. We disagree.

We begin by setting forth the applicable standard of review. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for [a writ of] habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification [to appeal] constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits." (Internal quotation marks omitted.) *Melendez* v. *Commissioner of Correction*, 151 Conn. App. 351, 357, 95 A.3d 551, cert. denied, 314 Conn. 914, 100 A.3d 405 (2014). To establish an abuse of discretion, the petitioner must "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Emphasis in original; internal quotation marks omitted.) *Robinson* v. *Commissioner of Correction*, 167 Conn. App. 809, 816, 114 A.3d 493, cert. denied, 323 Conn. 925,       A.3d (2016). "In determining whether the habeas court abused its discretion in denying the petitioner's request for certification [to appeal], we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Internal quotation marks omitted.) *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 724, 138 A.3d 430 (2016).

"In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010). "[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a govern-

ment witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, [our case law] require[s] that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." (Citations omitted; internal quotation marks omitted.) Id., 186.

The dispositive question in this case, and the threshold question in any claimed *Brady* violation based on an alleged undisclosed plea agreement with a cooperating witness, is whether that agreement actually existed. See *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000) ("[w]e first consider whether there was an undisclosed, implied plea agreement between [the witness] and the state"); *State* v. *Satchwell*, 244 Conn. 547, 561, 710 A.2d 1348 (1998) ("[t]he defendant, however, has failed to establish the necessary factual predicate to his claim, namely, that the state's attorney did, in fact, promise to dismiss the aiding and abetting arson murder charges against [the witness] as part of the plea agreement between [the witness] and the state"). The existence of the agreement is "a fact based claim to be determined by the trial court, subject only to review for clear error." *State* v. *Ouellette*, supra, 295 Conn. 187. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . ." (Internal quotation marks omitted.) *State* v. *Peterson*, 320 Conn. 720, 730, 135 A.3d 686 (2016). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 738. It is not enough to merely point to evidence in the record that contradicts the habeas court's findings. See *State* v. *Krijger*, 313 Conn. 434, 443, 448, 97 A.3d 946 (2014).

Here, the petitioner argues that the habeas court's determination that no agreement existed between Soler and the state is clearly erroneous because the record contains "overwhelming evidence" that there was an agreement, whether formal or implied. The evidence cited by the petitioner in support of this claim can be described fairly as plea bargaining discussions between Soler and the state. The habeas court expressly found Narus' testimony to be credible. Narus testified that the state had not reached a leniency for testimony agreement with Soler. Rather, the plea discussions had included discussions of possible dispositions, what Narus referred to as "hypotheticals," but ultimately the state decided it was not prepared to enter into a leniency

agreement with Soler. Specifically, Narus testified that the state was not prepared to offer any kind of leniency agreement because there was doubt about whether Soler ultimately would agree to testify, and the state was concerned about its ability to trust that Soler would not lie or otherwise contradict his previous statements to police, in which he implicated the petitioner.

Similarly, Soler's criminal trial attorney, Levy, testified that she had hoped that Soler's testimony and cooperation would lead to leniency from the state, but she had no commitment from the state on which to base this hope. Levy stated that she had no recollection of discussing an offer of a leniency agreement with Narus and that her notes from her representation of Soler did not reflect that any such offer was ever made. Rather, Levy's hope for leniency, and the advice she provided to Soler encouraging his cooperation, stemmed simply from her experiences of the sentencing process as a criminal defense attorney, which showed the state often will inform a sentencing judge of whether a criminal defendant assisted the state with any of its other investigations or prosecutions.

The habeas court considered at length the extent to which these discussions between Soler and the state were simply the normal course of pretrial negotiations between prosecutors and defendants in Connecticut. In considering the habeas court's conclusion that these discussions did not constitute an agreement requiring disclosure under *Brady*, we find our Supreme Court's decision in *State* v. *Floyd*, supra, 253 Conn. 700, to be instructive. In *Floyd*, our Supreme Court concluded that there was evidence that a key state's witness had engaged in discussions of favorable treatment from the state on pending criminal charges in exchange for testimony against the defendant, but that the witness had not yet received any commitment from the state that his testimony would lead to a lenient sentence. Id., 739–40. The trial court found there was documentary evidence demonstrating a direct link between the state's willingness to be lenient and the quality of the witness' testimony. Id., 739. Our Supreme Court concluded that this did not show an agreement between the state and the witness. Id. Rather, the witness had "[a]t most . . . a hope for leniency." Id., 740. On this basis, the court in *Floyd* concluded that "a reasonable fact finder would not be compelled to conclude that there was an implied plea agreement between [the witness] and the state," and that "the trial court's factual finding that there was no such implied agreement must stand." Id.

After a careful review of the parties' briefs and the record in the present case, we conclude that the habeas court's determination that Soler did not have an agreement with the state was not clearly erroneous. As in *Floyd*, the evidence relied on here by the petitioner simply shows, as the habeas court concluded, that nor-

mal plea bargaining discussions occurred and that those discussions did not result in any agreement between the parties. At most, Soler had a mere hope for leniency, with no commitment from the state. Because no agreement existed, the state did not violate its obligation to disclose favorable evidence under *Brady. State* v. *Ouellette*, supra, 295 Conn. 186. Accordingly, we conclude the habeas court did not abuse its discretion in denying certification to appeal because the petitioner's claim is not debatable among jurists of reason, a court could not resolve the issues in a different manner, and the questions raised do not deserve encouragement to proceed further.[5]

The appeal is dismissed.

In this opinion the other judges concurred.

[1] Our Supreme Court's opinion in the petitioner's direct appeal provides a full exposition of the factual events underlying the criminal trial. See *State* v. *Marquez*, 291 Conn. 122, 126–31, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Much of this information is not relevant to the narrow issues before the court here.

[2] The petitioner was acquitted of one count of robbery in the first degree.

[3] Escobar, the third surviving robbery victim, did not testify at the trial because the state could not locate him.

[4] "In *Brady* v. *Maryland* . . . the Supreme Court of the United States held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Internal quotation marks omitted.) *State* v. *Guerrera*, 167 Conn. App. 74, 79 n.1, 142 A.3d 447, cert. granted, 323 Conn. 922, A.3d (2016). Our Supreme Court has held that the obligation to disclose favorable evidence includes such evidence as to the existence of any plea agreement between the state and a key witness. See *State* v. *Ouellette*, 295 Conn. 173, 185–86, 989 A.2d 1048 (2010).

[5] Because we determine that the habeas court did not abuse its discretion in denying certification to appeal, we do not reach the petitioner's argument that this court should exercise its supervisory authority to "require that the state disclose *any* representation by a state's attorney, made to a cooperating witness, or their attorney, concerning the potential ultimate disposition of their pending criminal case prior to testifying." (Emphasis added.) We pause only to note that such a requirement would be an exceptionally broad use of an "*extraordinary* remedy" intended only to be used in guarding against defects of the "utmost seriousness" that call into question, not just the integrity of the trial at hand, but the entire judicial system itself. (Emphasis in original.) *State* v. *Marquez*, supra, 291 Conn. 166 (noting our Supreme Court exercises its supervisory authority only reluctantly and when claim arises placing "perceived fairness of the judicial system as a whole" in jeopardy [internal quotation marks omitted]).