******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMIE R. GOMEZ *v.* COMMISSIONER OF
CORRECTION
(AC 39328)

Lavine, Kahn and Bishop, Js.*

*Syllabus*

The petitioner, who had been convicted of the crimes of murder, felony
murder, and conspiracy to commit murder, sought a writ of habeas
corpus, claiming, inter alia, that his due process rights were violated
by the state's suppression of material exculpatory evidence in violation
of *Brady* v. *Maryland* (373 U.S. 83). Specifically, he claimed that the
state failed to disclose certain consideration that allegedly had been
offered in exchange for the testimony of two witnesses, V and S, both
of whom had been charged with various crimes in connection with
the underlying murder. The petitioner claimed that express agreements
existed between the state and V and S to bring their cooperation to the
attention of the sentencing court, and that the state had failed to disclose
such agreements. The habeas court rendered judgment denying the
habeas petition, from which the petitioner, on the granting of certifica-
tion, appealed to this court. *Held*:
1. The habeas court properly concluded that the state had not committed
   a *Brady* violation with respect to the agreements that existed between
   the state and V and S; that court's finding that agreements existed
   between the state and V and S, and that the agreements were limited
   to bringing their cooperation to the attention of the judicial authority
   posttrial was not clearly erroneous and was supported by the record,
   and because the evidence also supported the habeas court's finding that
   the state had disclosed the agreements, no *Brady* violation occurred.
2. The petitioner could not prevail on his claim that the state improperly
   failed to disclose impeachment evidence relating to how it had assisted
   in reducing bonds for V and S, which was based on his claim that
   transcripts of bond hearings involving V and S revealed the consideration
   offered to them with respect to a reduction of their bonds; the habeas
   court properly concluded that the petitioner failed to prove a *Brady*
   violation with respect to evidence of an informal understanding between
   the state and V and S, as the petitioner had equal access to the transcripts
   of the bond hearings and did not present any evidence at the habeas
   trial indicating an inability to obtain them.
3. The petitioner could not prevail on his claim that the state violated his
   rights to due process and a fair trial when, during his criminal trial, it
   knowingly presented, and failed to correct, the false testimony of V and
   S that they had not received any consideration from the state in exchange
   for their testimony, even though the state had promised to bring their
   cooperation to the attention of the sentencing court and had provided
   assistance in lowering their bonds; where, as here, the habeas court
   reasonably concluded that the state's express agreements to bring the
   cooperation of V and S to the attention of the judicial authority posttrial
   had been disclosed, the statements made during the bond modification
   hearings, which formed the substantive basis of the petitioner's claims
   with respect to undisclosed evidence of an informal understanding, took
   place in open court, and the petitioner had equal access to the transcripts
   for those proceedings, the petitioner failed to prove the existence of an
   undisclosed agreement or understanding, and, therefore, the state was
   not required to correct the allegedly false testimony of V and S.
4. The habeas court properly concluded that the petitioner was not denied
   the effective assistance of counsel as a result of the alleged failure of
   his trial counsel to adequately cross-examine V and S regarding their
   alleged agreements or understandings with the state; even if trial counsel
   was deficient in failing to specifically impeach V and S with certain
   transcripts, the petitioner failed to prove that he was prejudiced thereby,
   as the jury knew of the substantive terms of the witnesses' agreements
   with the state, could have reasonably inferred a connection between
   their cooperation and their reduced bonds, and was fully informed that
   the witnesses might have potential biases against the petitioner, and,

therefore, there was not a reasonable probability that the outcome of the petitioner's criminal trial would have been different had trial counsel impeached the witnesses with the various transcripts.

Argued September 11—officially released December 12, 2017

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Andrew P. O'Shea*, assigned counsel, for the appellant (petitioner).

*Stephen Carney*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Theresa Anne Ferryman*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. The petitioner, Jamie Gomez, appeals from the judgment of the habeas court denying his second petition for a writ of habeas corpus. Following that denial, the court granted his petition for certification to appeal. On appeal, the petitioner claims that the habeas court erred when it concluded that (1) his state and federal constitutional due process rights were not violated by the state's suppression of material exculpatory evidence concerning agreements or understandings that it allegedly had with two of its witnesses, (2) the state did not violate his state and federal constitutional rights to due process by knowingly presenting, and failing to correct, the false testimony from those witnesses, and (3) he was not denied his state and federal constitutional rights to the effective assistance of counsel when his trial counsel failed to properly cross-examine those witnesses regarding their alleged agreements or understandings with the state. Because we conclude that the petitioner failed to prove that the agreements or understandings were not disclosed, we are unpersuaded by the petitioner's first and second claims. We are also unpersuaded by the petitioner's third claim because, even if it is assumed that his trial counsel provided constitutionally deficient representation, the petitioner failed to prove that he was prejudiced. Accordingly, we affirm the judgment of the habeas court.[1]

The following facts and procedural history are relevant. In connection with the murder of Darrell Wattley, the state charged the petitioner and his codefendants, Anthony Booth and Daniel Brown, each with one count of murder in violation of General Statutes § 53a-54a, one count of felony murder in violation of General Statutes § 53a-54c, and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a.[2] The factual backdrop underlying the charges is set forth in our Supreme Court's decision and need not be repeated in full for this appeal. See *State* v. *Booth*, 250 Conn. 611, 614–17, 737 A.2d 404 (1999) (consolidated trial with three codefendants and Supreme Court consolidated appeals), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

The following facts from that decision, however, provide context for the petitioner's second habeas petition. On July 4, 1995, James "Tiny" Smith and Wattley fought one another at a party. Id., 614. During the fight, Wattley sliced Smith's throat with a box cutter, wounding him. Id. On July 13, 1995, when Smith, Brown, and the petitioner were at Booth's apartment in New London, "Booth told them that he had asked Angeline Valentin, who lived in the same building, to call Wattley over to the building so that Wattley and Smith could fight." Id.

"When Valentin called to say that Wattley was on his way, the four men left the building and went outside. [The petitioner] and Brown went to the north side of the building while Smith and Booth went to the south side and hid behind a bush. While they were waiting, Booth was talking on a cellular telephone to either Brown or [the petitioner]. After approximately fifteen minutes, a car arrived and Wattley got out. Wattley walked toward the north end of the building, where Brown and [the petitioner] were waiting. Smith and Booth then entered the building on the south side and began to ascend the stairs. When Smith and Booth reached the third floor, where Valentin's apartment was located, they heard gunshots below. Smith and Booth then ran to exit the building. As they descended the stairs, they saw Wattley lying face down in the second floor hallway with blood everywhere. Booth then stabbed Wattley a couple of times before Smith and Booth fled the building." Id., 614–15. Shortly after the incident, the petitioner drove his codefendants and Smith across town, where they all agreed to come up with alibis. Id., 615.

Following a consolidated jury trial, the petitioner and his codefendants were found guilty of murder and conspiracy to commit murder. Id., 613. During the consolidated trial, John F. Cocheo, now deceased, represented the petitioner, Jeremiah Donovan represented Brown, and Bruce Sturman represented Booth. On January 7, 1997, the court, *Parker, J.*, sentenced the petitioner to a term of imprisonment of fifty years on the murder conviction and a concurrent sentence of fifteen years on the conspiracy to commit murder conviction, for a total effective sentence of fifty years to serve. Our Supreme Court affirmed the petitioner's conviction. See id., 617, 663.

On September 18, 2000, the petitioner filed his first self-represented petition for a writ of habeas corpus (first petition). In a two count revised petition, he alleged ineffective assistance of counsel against Cocheo and actual innocence. The habeas court denied his first petition, and this court affirmed the denial. See *Gomez* v. *Commissioner of Correction*, 80 Conn. App. 906, 836 A.2d 1279 (2003), cert. denied, 267 Conn. 917, 841 A.2d 219 (2004).

On May 16, 2013, the petitioner filed a second self-represented petition for a writ of habeas corpus. In his amended petition (present petition), he first alleged that the state violated his right to due process by failing to disclose material exculpatory evidence. Specifically, he alleged that the state told Smith and Valentin that, in exchange for their testimony, it would assist in (1) reducing their bonds and (2) disposing of their charges in a manner favorable to them, and that it failed to disclose this information.[3] He also alleged that the state violated his right to due process when the prosecutor

failed to correct the false testimony of Smith and Valentin, who both testified at the consolidated trial that the state had not offered them "consideration" in exchange for their testimony. Additionally, he alleged that Cocheo's failure to adequately impeach Valentin and Smith deprived him of his right to the effective assistance of trial counsel.[4] The respondent, the Commissioner of Correction, filed his return on January 12, 2016, denying the material allegations of the present petition.[5]

On May 23, 2016, the habeas court denied the present petition in a written decision. It made several relevant findings of fact, including: "(a) The petitioner has failed to demonstrate that underlying trial counsel (Cocheo) was unaware of the existence of an agreement between Smith and Valentin and the prosecuting authority to bring their cooperation to the attention of the judicial authority posttrial. The evidence demonstrated that at least one other defense attorney in the consolidated trial was made aware of the agreement; (b) The petitioner has failed to demonstrate that the underlying trial testimony of Smith and Valentin was 'false' as suggested by the petitioner, as opposed to, for example, their uncertainty as to the likely posttrial sentencing scenario. The nature and circumstances of Smith and Valentin's 'agreements' were thoroughly explored and dissected on both direct and cross-examination. There is no reasonable probability that the jury was misled in this regard; (c) Nothing about the nature of the agreements or their disclosure was violative of *Brady*[6] or *Giglio* [v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)][7]; and (d) The petitioner has failed to demonstrate, as was the case in the first habeas trial, that Attorney Cocheo was deficient in any regard, including cross-examining Smith and Valentin." (Footnotes added.)

The petitioner filed a motion for articulation, which the habeas court denied on September 23, 2016. He did not seek review of that denial. See Practice Book §§ 66-5 and 66-7. This appeal followed. Additional facts will be set forth as necessary.

"In evaluating the merits of the underlying claims on which the petitioner relies in the present appeal, we observe that [when] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 785–86, 166 A.3d 815, cert. denied, 327 Conn. 957, A.3d (2017). Because the issues presented in this appeal involve mixed questions of law and fact, our review is plenary. See, e.g., *George M.* v. *Commissioner of Correction*, 290 Conn. 653, 659, 966 A.2d 179 (2009).

I

We begin with the petitioner's claim that the state failed to disclose the "consideration" that it had allegedly offered Valentin and Smith in exchange for their testimony. We understand his claim to be supported by two separate arguments. First, he appears to argue that express agreements existed between the state and the witnesses to bring their cooperation to the attention of the sentencing court, and that the state failed to disclose them.[8] Second, he appears to argue that the state failed to disclose impeachment evidence relating to how the state assisted in reducing the witnesses' bonds. The respondent argues that the record demonstrates that the state had disclosed the existence and terms of any agreement between the state and the witnesses. Additionally, the respondent argues that any statements made during the bond hearings for Valentin and Smith, which form the basis of the petitioner's claim, "were public proceedings, open to anyone with interest, and transcripts were presumably available upon request." We agree with the respondent.

The following additional facts and procedural history are relevant. On September 13, 1995, Valentin testified during a probable cause hearing for Booth that implicated Booth in Wattley's murder. During Valentin's bond hearing on October 5, 1995, Bernard Steadman, her attorney, represented: "I have discussed this matter with the state and they would—my understanding is that there would be no objection to her moving out of state, should she be released on a bond, and provided that she maintain contact with—to or with their office either through me or directly." Steadman asked the court to consider releasing Valentin on a promise to appear and allowing her to travel to New Jersey given her cooperation with the state and because Wattley's murder appeared to be gang related. Paul E. Murray, the supervisory assistant state's attorney (prosecutor),[9] informed the court: "I did indicate to [Steadman], Your Honor, that I would bring to the court's attention [Valentin's] cooperation, and I think I've done that." The prosecutor also informed the court that he had spoken with Valentin's mother about Valentin going to New Jersey and that "both [Valentin] and her mother have agreed . . . to keep the state apprised as to her location and how she can be reached . . . ." In the event that she did not keep the state apprised of her location, the prosecutor stated that "[the state] will find her and she will have forfeited whatever benefits she has gained

from her cooperation to this point." He also stated: "I'm not sure whether a promise to appear is the appropriate thing, but I think certainly a substantial reduction in her bond is appropriate." Thereafter, the prosecutor stated that he would not object to a written promise to appear and informed the court: "I think if I were in your position, I would not be averse to a written promise to appear. I'm trying to be careful as to—as to the record I'm making."

After considering, inter alia, the "cooperative aspects of this matter," the court, *Purtill, J.*, reduced Valentin's bond from $100,000 to a written promise to appear and permitted her to reside in New Jersey. Immediately following that decision, the following colloquy took place in open court:

"[The Prosecutor]: . . . For the record, I would indicate I do not disagree at all with the court's decision. I was trying to be careful with the record because of obvious cross-examination effect. In consideration, I want the record to be clear that *the only representations made to* [*Valentin*] *were that any cooperation would be brought to the attention of the sentencing court. There was no quid pro quo for a specific bond recommendation.*

"[Steadman]: That is true, Your Honor." (Emphasis added.)

On March 14, 1996, during a consolidated probable cause hearing for Brown and the petitioner, Smith provided testimony that implicated Brown and the petitioner in Wattley's murder. The petitioner and Cocheo attended this hearing, and so did Donovan, Brown's lawyer. At the beginning of Smith's testimony, the following examination took place in open court:

"[The Prosecutor]: And you are in fact charged with murder, felony murder, and conspiracy to commit murder with respect to the case that we are going to talk about, is that right?

"[Smith]: Yes.

"[The Prosecutor]: And is it fair to say that *other than bringing your cooperation to the attention of the sentencing court*, you haven't been promised anything in return for your testimony?

"[Smith]: No.

"[The Prosecutor]: You say 'no.' That is the truth, isn't it?

"[Smith]: That's the truth." (Emphasis added.)

On May 3, 1996, approximately two months after Smith testified at the consolidated probable cause hearing, the court, *Parker, J.*, addressed Smith's motion for modification of his bond. The state did not object to the motion. Counsel for Smith represented that the reasons for requesting a bond modification were that

Smith's life had been threatened and he had cooperated with the state. Thereafter, the court reduced Smith's bond from $500,000 to $100,000 and permitted him to travel throughout the continental United States.

On May 10, 1996, the court, *Purtill, J.*, amended the terms of Smith's bond, making it a $100,000 nonsurety bond with a nominal real estate bond. During this hearing, the prosecutor stated that the state had been in contact with a parole officer in Alabama, who agreed to arrange weekly reporting with Smith if he were allowed to reside there. The court asked that the state "reduce that condition to writing and give a copy to . . . Smith." Smith was then permitted to be released on bond.

At his habeas trial on the present petition, the petitioner called Donovan, trial defense counsel for Brown, and Sturman, trial defense counsel for Booth, to testify. Many of the questions that the petitioner asked on direct examination related to whether Donovan or Sturman had seen the bond hearing transcripts for Valentin and Smith, and whether they would have impeached Valentin and Smith with the information contained in those transcripts. Specifically, the petitioner asked Donovan and Sturman whether they would have impeached Valentin and Smith regarding the state's promise to bring their cooperation to the attention of the sentencing judge and whether they would have impeached those witnesses with the "connection" between their cooperation and their reduced bonds. Donovan and Sturman both testified that they would have used the testimony from those transcripts to impeach Valentin and Smith. And neither Donovan nor Sturman recalled seeing the bond modification hearing transcripts prior to testifying at the habeas trial on the present petition.

Donovan also testified that, on four or five occasions, "[the prosecutor] told me . . . that the only promise that had been [made] to [Valentin and Smith] is [that] their cooperation would be brought to the attention of the judge." On the basis of his extensive experience dealing with the New London County Office of the State's Attorney, he also testified that the general procedure was not to offer specific "deals."

Contrary to Donovan's testimony, Sturman testified that, although he knew that Valentin had been released on a reduced bond, he was never informed that the state had offered any promises to either Valentin or Smith in exchange for their cooperation. He echoed Donovan's testimony, however, that the standard procedure in New London "was that no specific deals were made between a cooperating witness and the prosecution."

The respondent did not call any witnesses or present any evidence beyond cross-examination of Donovan and Sturman. During his argument to the habeas court,

the petitioner focused on the contents of the bond hearing transcripts in support of his *Brady* claim, noting that Donovan and Sturman "had never seen these proceedings. They didn't know this information [contained in the witnesses' bond hearing transcripts]."

"The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . . Any . . . understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of *Brady* principles. . . .

"The question of whether there existed an agreement between [a witness] and the state is a question of fact." (Citations omitted; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 152–53, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011). "Furthermore, the burden is on the defendant to prove the existence of undisclosed exculpatory evidence." *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000).

As previously noted, the petitioner essentially makes two separate arguments in support of his *Brady* claim. First, he contends that express agreements existed between the state and Valentin and Smith to bring their cooperation to the attention of the sentencing court, and that the state failed to disclose them. Second, the petitioner argues that the state failed to disclose impeachment evidence relating to how the state assisted in reducing the bonds for Valentin and Smith. We reject each argument and address them in turn.

A

The petitioner first argues that express agreements existed between the state and the witnesses to bring their cooperation to the attention of the sentencing court, and that the state failed to disclose them. We agree that the state had express agreements with Valentin and Smith to bring their cooperation to the attention of the sentencing court, but disagree that the state failed to disclose them.

The habeas court found: "The petitioner has failed to demonstrate that underlying trial counsel (Cocheo) was unaware of the existence of an agreement between Smith and Valentin and the prosecuting authority to bring their cooperation to the attention of the judicial authority posttrial. The evidence demonstrated that at least one other defense attorney in the consolidated trial was made aware of the agreement." This finding is relevant in two material respects. First, it indicates that the habeas court found that agreements did, in

fact, exist, and that they were limited to "bring[ing] [Valentin's and Smith's] cooperation to the attention of the judicial authority posttrial." Second, the court's finding indicates that another defense attorney was aware of these agreements that the state had with Valentin and Smith and that the petitioner failed to prove that Cocheo was unware of such agreements.

On the basis of our review of the record, we conclude that the habeas court's finding that agreements existed between the state and the cooperating witnesses, and that the agreements were limited to bringing their cooperation to the attention of the judicial authority posttrial, was not clearly erroneous. The prosecutor's statements during Valentin's bond hearing on October 5, 1995, indicate that an agreement existed with Valentin. The prosecutor's direct examination of Smith during the petitioner's consolidated probable cause hearing on March 14, 1996, which Cocheo and the petitioner attended, also indicates that the state had an agreement with Smith. During Valentin's bond hearing, Valentin's attorney confirmed that the agreement with Valentin was limited to bringing her cooperation to the attention of the sentencing authority and that it did not include a quid pro quo for a specific bond recommendation. Additionally, Donovan testified that the prosecutor informed him on multiple occasions that agreements existed, but that the only promise was to bring the cooperation of Valentin and Smith to the attention of the court. Because this evidence supports the habeas court's finding that the state had limited agreements to bring the cooperation of Valentin and Smith to the attention of the court posttrial, we conclude that the habeas court's finding was not clearly erroneous.[10]

The habeas court's finding also reflects that the state disclosed the agreements. During the habeas trial, Donovan admitted to knowing about the agreements between the state and the witnesses. Cocheo and the petitioner attended the petitioner's consolidated probable cause hearing when the prosecutor asked Smith, in open court, whether the state had promised him anything other than bringing his cooperation to the attention of the sentencing court. This evidence supports the habeas court's finding that the state disclosed the agreements.

"Evidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*." (Internal quotation marks omitted.) *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 726, 138 A.3d 430 (2016). Because the habeas court found that the agreements had been disclosed, it properly concluded that the state had not committed a *Brady* violation with respect to the express agreements that existed.

B

The petitioner next argues that the state failed to disclose impeachment evidence relating to how it assisted in reducing the bonds for Valentin and Smith. We disagree.

The petitioner appears to argue that the state offered to assist in reducing the bonds for Valentin and Smith in exchange for their testimony based on the following: (1) they were required to stay in contact with the state while out on bond; (2) the court considered their cooperation in reducing their bonds; and (3) the state did not object to their motions to modify their respective bonds. "Our Supreme Court has acknowledged that even when certain undisclosed evidence did not support a finding of an implied agreement between the state and a witness, such evidence may nonetheless constitute impeachment evidence under *Brady* if it reasonably could be construed to suggest an 'informal understanding' between the state and a witness." *Elsey* v. C*ommissioner of Correction*, supra, 126 Conn. App. 155; see also *State* v. *Floyd*, supra, 253 Conn. 740–46 (addressing circumstances where state failed to disclose that it had not opposed witness' request to reduce bond to promise to appear).

The petitioner's argument that the state failed to disclose impeachment evidence stems from statements made during the witnesses' respective bond hearings. He argues that the transcripts of these proceedings reveal the "consideration" offered to Valentin and Smith with respect to a reduction of their bonds. It is significant that the *only* evidence offered by the petitioner of an informal understanding between the state and Valentin and Smith regarding a reduction of their bonds were these transcripts. "*Brady* is designed to assure that the defendant is not denied access to exculpatory evidence known or available to the state but unknown *or unavailable to him*." (Emphasis added.) *State* v. *Skakel*, 276 Conn. 633, 702, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

Under the circumstances of the present case, the habeas court properly concluded that the petitioner failed to prove a *Brady* violation with respect to evidence of an informal understanding between the state and Valentin and Smith.[11] The petitioner had equal access to the transcripts of the bond modification proceedings and did not present any evidence at the habeas trial indicating an inability to obtain them. See, e.g., *State* v. *Simms*, 201 Conn. 395, 404–408, 518 A.2d 35 (1986) (rejecting defendant's argument that state failed to disclose evidence of witness' mental health records because relevant information was matter of public record); *State* v. *Crump*, 43 Conn. App. 252, 263, 683 A.2d 402 (defendant failed to prove *Brady* violation because, inter alia, he "failed to demonstrate that . . . he did not know of [a victim's] testimony or have the opportunity to purchase the transcripts [from his cocon-

spirator's] probable cause hearing and trial"), cert. denied, 239 Conn. 941, 684 A.2d 712 (1996). Accordingly, the petitioner failed to prove that the state committed a *Brady* violation with respect to impeachment evidence relating to a reduction of the bonds for Valentin and Smith.

## II

We next address the petitioner's claim that his rights to due process and a fair trial were violated when the state knowingly presented the false testimony of Valentin and Smith during his consolidated criminal trial. Specifically, he argues that both witnesses falsely testified that they had not received any consideration from the state in exchange for their testimony and that the state failed to correct their false testimony. He argues that the state, in fact, promised to bring their cooperation to the attention of the sentencing court and provided assistance in lowering their bonds.[12] The respondent argues, inter alia, that the petitioner's claim fails because the testimony in question did not involve an undisclosed agreement or understanding. We agree with the respondent.

The following additional facts and procedural history are relevant. Smith and Valentin both testified on behalf of the state during the petitioner's consolidated trial. At trial, Valentin implicated the petitioner and his codefendants in Wattley's murder, but denied receiving any consideration from the state in exchange for her testimony.[13] Smith similarly implicated the petitioner and his codefendants, but denied receiving consideration from the state in exchange for his testimony.[14] At oral argument before this court, the respondent agreed that the testimony of these witnesses was "significant" and "extremely important" to convicting the petitioner and his codefendants.

"Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* [v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)] require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . .

"The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases is the existence of an *undisclosed* agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 186–87, 989 A.2d 1048 (2010); see also *State* v. *Jordan*, 314 Conn. 354, 369–71, 102 A.3d 1 (2014) (setting forth governing standards for proving that state failed to correct false or misleading testimony); *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–73, 71 A.3d 512 (2013) (same). "[T]he

burden is on the defendant to prove the existence of undisclosed exculpatory evidence." *State* v. *Floyd*, supra, 253 Conn. 737.

We conclude that the petitioner's *Napue/Giglio* claim is controlled by our recent decision in *Hines* v. *Commissioner of Correction*, supra, 164 Conn. App. 712. There, this court held that, where a case does not involve an undisclosed agreement or understanding, the state is not required to correct a witness' allegedly false testimony. Id., 728.[15] As previously noted, the habeas court reasonably concluded that the state's express agreements to bring the cooperation of Valentin and Smith to the attention of the judicial authority posttrial had been disclosed. Additionally, the statements made during the bond modification hearings, which form the substantive basis of the petitioner's *Brady*, *Napue*, and *Giglio* claims with respect to undisclosed evidence of an informal understanding, took place in open court. The petitioner had equal access to the transcripts for those proceedings. See, e.g., General Statutes § 51-61 (c) (court reporter "shall, when requested, furnish . . . *to any other person*, within a reasonable time, a transcript of the proceedings" [emphasis added]); *State* v. *Ross*, 208 Conn. 156, 160, 543 A.2d 284 (1988) (noting 1988 amendment to § 51-61 permitting "any other person" to obtain transcript of proceedings). Under these circumstances, the habeas court properly concluded that the state did not violate *Napue/Giglio*, because the petitioner failed to prove the existence of an undisclosed agreement or understanding.[16]

## III

The petitioner's final claim is that he was deprived of his right to the effective assistance of trial counsel when Cocheo failed to adequately cross-examine Valentin and Smith. Specifically, he argues that, if Cocheo knew and had access to evidence that Valentin and Smith received consideration from the state, objective standards of reasonable performance required that he impeach the witnesses with that evidence. He argues that there is a reasonable probability that the outcome of the trial would have been different if Cocheo had used this evidence. We disagree.

The following additional facts and procedural history are relevant. During his direct examination of Valentin, the prosecutor questioned her about her pending charge of accessory to assault in the first degree in connection with Wattley's murder. He specifically asked her whether she had testified at a "preliminary hearing" and whether, subsequent to testifying, her bond was reduced to a promise to appear. She agreed that her bond was reduced after she testified at that hearing. She further testified that she hoped that her testimony against the petitioner and his codefendants would help her case. Additionally, Donovan, Sturman, and Cocheo each cross-examined her about the circumstances sur-

rounding her bond reduction.[17]

In response to the prosecutor's questions, Smith admitted that he faced criminal charges in connection with Wattley's murder, namely, murder, conspiracy to commit murder, and felony murder. He testified that he hoped that he would not go to jail and that his testimony would show "that [he] had nothing to do with this." Smith further agreed with the prosecutor that his bond was reduced after testifying at the consolidated probable cause hearing for Brown and the petitioner, that he returned to Alabama, and that the state paid for his flight, hotel, and food while he was in Connecticut for the petitioner's trial. As with Valentin, Donovan and Sturman cross-examined Smith about his bond reduction.[18] Part of their cross-examination focused on the potential connection between his cooperation and a reduction in his bond.[19] Other portions of their cross-examination sought to expose their defense theory that Smith fabricated his testimony because *he* murdered Wattley.[20]

Donovan, Sturman, and Cocheo also commented on the circumstances surrounding the bond reductions for Valentin and Smith during final arguments to the jury, suggesting there was a connection between their bond reductions and testimony. They argued that the jury should consider this connection in assessing the witnesses' credibility. The court also instructed the jury to pay careful attention to "accomplice testimony" and that such testimony "may be colored" by a witness' hope for some favorable treatment.[21]

"To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a 'performance prong' and a 'prejudice prong.' To satisfy the performance prong, a [petitioner] must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys [as measured by prevailing professional norms]. . . . To satisfy the prejudice prong, a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. . . . The claim will succeed only if both [*Strickland*] prongs are satisfied. . . . It is well settled that [a] reviewing court can find against a petitioner on *either* ground, whichever is easier." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Arroyo* v. *Commissioner of Correction*, 172 Conn. App. 442, 458, 160 A.3d 425, cert. denied, 326 Conn. 921, 169 A.3d 235 (2017). In these circumstances, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Hinton* v. *Alabama*, U.S. , 134 S. Ct. 1081, 1089, 188 L. Ed. 2d 1 (2014).

Even if we were to assume, which we do not, that

Cocheo's failure to specifically impeach Valentin and Smith with the transcripts from the probable cause hearings and their respective bond hearings constituted deficient performance, we conclude that the petitioner failed to prove prejudice.

The agreements that Valentin and Smith had with the state did not require that the state advance a specific recommendation in exchange for their testimony; rather, the substance of the agreements was that both Valentin and Smith hoped that their cooperative testimony might favorably be taken into account by the sentencing court. During the consolidated trial, Valentin and Smith both testified, in substance, that they hoped that their cooperative testimony would be taken into account with regard to their pending charges. Valentin and Smith also agreed with the prosecutor that their bonds were reduced following their testimony at the probable cause hearings for Booth, Brown, and the petitioner. And Cocheo and codefense counsel thoroughly explored the circumstances surrounding the bond reductions for both witnesses. Questioning Valentin and Smith about the contents of the transcripts, therefore, would have provided the jury with little additional information.

The court also informed the jurors that those witnesses who admitted to participating in the criminal conduct charged by the state may be looking for favorable treatment and "may have such an interest in the outcome of this case that his or her testimony may be colored by that fact." This instruction reminded the jurors of Valentin's and Smith's potential biases, and jurors are presumed to follow the court's instructions. See, e.g., *State* v. *Fernandez*, 169 Conn. App. 855, 870, 875, 153 A.3d 53 (2016).

Our conclusion is further buttressed by the closing remarks of Cocheo and Sturman. Cocheo argued: "[Valentin] said, I had no idea at all I was going to be released. I had no idea, hadn't thought about it, hadn't talked about it at all. I ask you, is that credible? Is that credible? All she says is that she hopes her testimony will help her case. We know it helped so far; she's not in jail anymore." Sturman argued during his closing, "don't you think that [Smith's] testimony is flavored by his expectation of what's going to happen if he continues to play ball?" Such closing remarks urged the jury to discredit Valentin's and Smith's testimony based on their reduced bonds and their cooperation with the state.

We are not persuaded that there is a reasonable probability that, had Cocheo impeached Valentin or Smith with either the probable cause hearing transcripts or their respective bond hearing transcripts, the outcome of the petitioner's trial would have been different. The jury knew of the substantive terms of the witnesses' agreements with the state, could have reasonably

inferred a connection between their cooperation and their reduced bonds, and was fully informed that the witnesses might have potential biases against the petitioner. Under the circumstances of the present case, we are confident that the outcome of the petitioner's trial would not have been different if Cocheo specifically impeached Valentin and Smith with the relevant transcripts. The habeas court, therefore, properly concluded that the petitioner was not denied the effective assistance of counsel at his criminal trial.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Although the petitioner claims that his rights under article first, §§ 8 and 9, of the constitution of Connecticut were violated, he has failed to provide an independent analysis under our state constitution. Accordingly, we deem his state constitutional claims abandoned. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 748 n.1, 155 A.3d 188 (2017).

[2] After the close of evidence, the state filed substitute informations against the petitioner and Booth, which removed their felony murder charges and charged each of them with one count of murder and one count of conspiracy to commit murder.

[3] The state charged Smith with murder, felony murder, and conspiracy to commit murder, and also charged Valentin with accessory to assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-59.

On March 16, 2000, Smith pleaded guilty to manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1) and was sentenced to one year and three months incarceration. On January 13, 1997, Valentin pleaded guilty to accessory to assault in the third degree in violation of General Statutes §§ 53a-8 and 53a-61 (a) (1) and received a suspended sentence of one year.

[4] In his present petition, the petitioner also raised claims of judicial bias and ineffective assistance of counsel of his first habeas counsel. He withdrew his judicial bias claim prior to trial and does not press his ineffective assistance of habeas counsel claim in this appeal.

[5] The respondent did not plead procedural default or successive petition with regard to any of the petitioner's claims. See Practice Book §§ 23-29 and 23-30 (b); see also *Zollo* v. *Commissioner of Correction*, 133 Conn. App. 266, 277–80, 35 A.3d 337 (discussing and applying successive petition doctrine), cert. granted, 304 Conn. 910, 39 A.3d 1120 (2012) (appeal dismissed May 1, 2013); *Milner* v. *Commissioner of Correction*, 63 Conn. App. 726, 731–34, 779 A.2d 156 (2001) (discussing procedural default). We, therefore, decide this appeal on the merits of the petitioner's claims. See, e.g., *Quint* v. *Commissioner of Correction*, 99 Conn. App. 395, 403, 913 A.2d 1120 (2007) (petitioner's claim "should be heard on its merits" when respondent fails to raise procedural default).

[6] See *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[7] See also *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

[8] The petitioner alleged in his present petition that the prosecuting authority offered to assist Valentin and Smith in "disposing of their charges in a manner more favorable to them," but failed to disclose such offers. In support of this allegation, he only argues that an agreement existed to bring the witnesses' cooperation to the attention of the sentencing court. He made this same, limited argument to the habeas court. He fails to direct our attention to specific points in the record that otherwise support his claim. We follow the petitioner's lead and limit our analysis to his argument that the state had express agreements with Valentin and Smith to bring their cooperation to the attention of the sentencing court, but failed to disclose them. See, e.g., *Bharrat* v. *Commissioner of Correction*, 167 Conn. App. 158, 181–82, 143 A.3d 1106 (declining to review argument on appeal that was never raised in habeas court), cert. denied, 323 Conn. 924, 149 A.3d 982 (2016); see also *Solek* v. *Commissioner of Correction*, 107 Conn. App. 473, 480, 946 A.2d 239 ("[i]t is not the responsibility of the trial judge . . . to search a record, often, in a habeas case, involving hundreds of pages of

transcript, in order to find some basis for relief for a petitioner"), cert. denied, 289 Conn. 902, 957 A.2d 873 (2008).

After reviewing the record, however, we note that it does contain statements during Smith's plea hearing, held on March 16, 2000, after our Supreme Court affirmed the petitioner's conviction, from which it can be inferred that the state had an agreement or understanding with Smith. The following colloquy took place between the prosecutor, Paul E. Murray, defense counsel for Smith, Anthony Basilica, and the court in connection with the prosecutor providing the factual basis for Smith pleading guilty to manslaughter in the second degree:

"[The Prosecutor]: We recognize and have recognized from the beginning the value of [Smith's] cooperation. It has been the state's position that with respect to . . . Booth, there was sufficient evidence and all probability to convict . . . Booth of murder and conspiracy to commit murder without the assistance of [Smith] because . . . Booth had been injudicious in his comments and had made statements in the presence of police officers, among other things, that clearly showed his involvement. With respect, however, to . . . Gomez and . . . Brown, the state would have had a difficult, if not impossible, case without the assistance of [Smith]. It was in fact [Smith's] cooperation that led to their arrest. He testified at their probable cause hearing, and he testified extensively at the trial. . . .

"*Early in the proceedings, after the trial of . . . Booth, Brown, and Gomez, as long ago as when Judge Purtill was . . . still the presiding judge in this judicial district on the criminal side, we had had discussions about the disposition in this case, and the state has always offered a plea to a manslaughter charge. And the state has always offered to agree to a recommendation of the state of a ten year sentence to be served with [Smith] reserving the right to argue for less. Again, as long ago as when Judge Purtill was presiding and Judge Purtill had heard the testimony of [Smith] at the probable cause hearing, Judge Purtill had indicated his inclination to impose a substantially lesser sentence than the ten years that the state was recommending. We have been aware of that from the beginning.* And I know that this court has indicated a sentence of, I believe, [fifteen] months. . . .

"So, that is the basis on which this plea is entered, and factual basis on which the charges are brought.

"The Court: Thank you. Attorney Basilica, is that what had been discussed with . . . Smith?

"[Basilica]: Yes, Your Honor." (Emphasis added.)

The prosecutor's statements during the March 16, 2000 proceeding suggest that an agreement or understanding existed, at some point in time, between the state and Smith regarding a favorable disposition to his pending criminal charges. It is unclear on this record, however, as to precisely when that agreement or understanding might have existed. The petitioner did not call the prosecutor or Smith to testify during his habeas trial and, therefore, we are left to speculate as to when such an agreement or understanding might have existed.

[9] Murray represented the state at the petitioner's consolidated criminal trial. He also represented the state in connection with the criminal proceedings against Valentin and Smith.

[10] The habeas court concluded that no agreements existed between Valentin and Smith, on the one hand, and the state, on the other, insofar as there was no specific agreement as to what sentence the state would recommend. On the basis of our review of the record, that conclusion is amply supported by the record. But that conclusion is incorrect, however, insofar as it ignores the fact that the state *had agreed* to bring the cooperation of Valentin and Smith to the attention of the sentencing court.

[11] We note that the habeas court did not explicitly find that the state disclosed or otherwise did not suppress the impeachment evidence relating to how the state allegedly assisted Valentin and Smith in reducing their bonds. The habeas court's memorandum of decision simply concludes that "[n]othing about the nature of the agreements or their disclosure was violative of *Brady* or *Giglio.*" On the basis of the evidence before it, including the transcripts from the respective bond hearings for both witnesses, it is implicit in the habeas court's conclusion that the petitioner failed to prove that the state did not disclose or otherwise suppressed this impeachment evidence. See, e.g., *Charlotte Hungerford Hospital* v. *Creed*, 144 Conn. App. 100, 116, 72 A.3d 1175 (2013) (appellate courts read ambiguous memorandum of decision to support, rather than undermine decision).

[12] As in his *Brady* claim, the petitioner makes the general assertion that

the witnesses received consideration from the state with respect to their eventual sentences. As previously noted in footnote 8 of this opinion, we understand the petitioner's argument to be limited to the state's promise to bring Valentin's and Smith's cooperation to the attention of the sentencing court.

[13] During direct examination, the prosecutor questioned Valentin about her pending criminal charges. The following portion of that examination is relevant:

"[The Prosecutor]: Do you have any idea what's going to happen to your case in the end?

"[Valentin]: No, I don't.

"[The Prosecutor]: *Has anybody promised you anything*?

"[Valentin]: *No*.

\*\*\*

"[The Prosecutor]: Do you hope that by being here and testifying it will help your case?

"[Valentin]: Yes, I hope so.

"[The Prosecutor]: But you don't know for sure what's going to happen?

"[Valentin]: No." (Emphasis added.)

Valentin subsequently confirmed that the state had not promised her anything during cross-examination and redirect examination.

[14] The prosecutor similarly asked Smith about his pending criminal charges in connection with Wattley's murder. The following exchange took place during direct examination:

"[The Prosecutor]: Do you have any idea what's going to happen in the criminal charges against you?

"[Smith]: No, I don't.

"[The Prosecutor]: *Did anybody promise you anything?*

"[Smith]: *No*.

"[The Prosecutor]: Do you have some hopes as to what might happen to them, at least in part as a result of your testimony?

"[Smith]: Yes.

"[The Prosecutor]: What do you hope?

"[Smith]: That they find out the truth, and that I had nothing to do with this." (Emphasis added.)

Smith subsequently confirmed that the state had not promised him anything in return for his statements to police or testimony at trial, and that there was no connection between his reduced bond and cooperating with the state.

[15] In his brief to this court, the petitioner argued that *Hines* should be overruled and requested en banc consideration of his appeal. On July 26, 2017, this court denied the petitioner's motion for en banc consideration.

[16] Although we conclude that the present case is controlled by *Hines*' rationale that the state is not required to correct a witness' allegedly false testimony when the case does not involve an undisclosed agreement or understanding, we recognize that there is language in *State* v. *Jordan*, 135 Conn. App. 635, 42 A.3d 457 (2012), rev'd in part on other grounds, 314 Conn. 354, 102 A.3d 1 (2014), suggesting that a prosecutor is obligated to correct the record under similar circumstances. In *Jordan*, this court held that, although the state had informed the court and defense counsel of agreements to bring two witnesses' cooperation to the court's attention, the prosecutor still had a duty to correct the witnesses' subsequent misleading testimony when both witnesses denied the existence of any agreements with the state. Id., 666. On appeal to our Supreme Court, the state raised the alternative ground for affirmance in that this court improperly concluded that the prosecutor had violated the standards set forth by *Napue*. *State* v. *Jordan*, supra, 314 Conn. 366 n.6. Notably, our Supreme Court stated: "We agree with the Appellate Court that the alleged improprieties were harmless and thus need not reach the alternative grounds for affirmance. *Nevertheless, nothing in this opinion should be construed to suggest that we concur in the Appellate Court's determination that improprieties occurred*." (Emphasis added.) Id., 369 n.7.

Nonetheless, this court and our Supreme Court have stated that a prerequisite to a claim under *Brady*, *Napue*, and *Giglio* is the existence of an *undisclosed* agreement or understanding between the cooperating witness and the state. *State* v. *Ouellette*, supra, 295 Conn. 186–87; *Hines* v. *Commissioner of Correction*, supra, 164 Conn. App. 728. Because of that precedent, we affirm the habeas court's decision that the state did not commit a *Napue/Giglio* violation.

[17] For example, the following examination took place during Donovan's

cross-examination of Valentin:

"[Donovan]: After you testified against . . . Booth, you were released from jail, weren't you?

"[Valentin]: Yes, I was.

"[Donovan]: Do you think there might be, there just might be, some connection between you testifying against . . . Booth and your not being in jail anymore?

"[Valentin]: No.

"[Donovan]: You don't see any connection at all?

"[Valentin]: (Witness nods in the negative.)"

[18] Cocheo did not cross-examine Smith about his bond reduction.

[19] For example, the following exchange took place during Donovan's cross-examination of Smith:

"[Donovan]: . . . As you sit here today, you recognize that there's some connection between your being a free man today and your testifying against these defendants?

"[Smith]: Rephrase that again.

"[Donovan]: Do you think that there may be a connection between your being a free man today—

"[Smith]: I'm not totally free.

"[Donovan]: When you leave this courtroom, you'll leave without shackles on, right?

"[Smith]: Yeah.

                          ***

"[Donovan]: But the point is, that there is a connection between your being able to enjoy all those things and the fact that you're sitting up on the stand trying to put the blame on these men, isn't there?

"[Smith]: I'm just telling the truth.

                          ***

"[Donovan]: It just happens that you came in and testified in a probable cause hearing, and then miraculously after that you were no longer in jail?

"[Smith]: I was bonded out."

[20] As noted by our Supreme Court, Wattley had sliced Smith's throat with a box cutter, "wounding him superficially," roughly one week before Wattley's murder. See *State* v. *Booth*, supra, 250 Conn. 614. The defense theory for Booth and Brown was that Smith had the motive to kill Wattley and did so in retaliation for Wattley's previous attack.

[21] The court instructed the jury in relevant part: "Now, in this case, we have what we call 'accomplice testimony.' Certain of the witnesses, by their own testimony, participated in one way or another in the criminal conduct charged by the state in this case. In weighing the testimony of [an] accomplice who is a self-confessed criminal, you must consider that fact. . . .

"Also, in weighing the testimony of [an] accomplice who has not yet been sentenced or whose case has not yet been disposed of, you should keep in mind that he or she may, in his or her own mind, be looking for or hoping for some favorable treatment in the sentence or disposition of his or her case, and that therefore, he or she may have such an interest in the outcome of this case that his or her testimony may be colored by that fact. . . .

"Therefore, the jury must look with particular care at the testimony of accomplices and scrutinize it very carefully before you accept it."