## JAMIE R. GOMEZ *v.* COMMISSIONER OF CORRECTION
### (SC 20089)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Ecker and Vertefeuille, Js.*

*Syllabus*

The petitioner, who had been convicted of the crimes of murder and conspiracy to commit murder, filed a second petition for a writ of habeas corpus, claiming, inter alia, that his first habeas counsel provided ineffective assistance by failing to raise the claim that the petitioner's due process rights were violated during his underlying criminal trial. Specifically, the petitioner claimed that the prosecutor failed to correct the allegedly false testimony of the state's key witnesses, S and V, that the state had not promised them anything in return for their cooperation and that they had not received any benefit in exchange for their cooperation. The habeas court rendered judgment denying the second petition, concluding that there was no due process violation, as the petitioner had failed to demonstrate that the trial testimony of S and V regarding their cooperation agreements with the state was false, the agreements were thoroughly explored on both direct and cross-examination, and at least one of the defense attorneys involved in the consolidated criminal trial of the petitioner and his codefendants was aware of the cooperation agreements. On the granting of certification, the petitioner appealed to the Appellate Court, which affirmed the habeas court's judgment. The Appellate Court concluded, inter alia, that the petitioner's due process rights under *Napue* v. *Illinois* (360 U.S. 264), and *Giglio* v. *United States* (405 U.S. 150), had not been violated because the agreements had been disclosed to defense counsel, and, therefore, the state was not required to correct the false testimony of S and V. Thereafter, the petitioner, on the granting of certification, appealed to this court. *Held* that the petitioner's due process rights were violated at his criminal trial when the prosecutor failed to correct the materially false testimony of S and V about benefits that the state had promised or provided to them in return for their cooperation, even though defense counsel had actual or constructive notice of the falsity of that testimony, and, accordingly, this court reversed the Appellate Court's judgment and remanded with direction to the habeas court to grant the petitioner's second habeas petition, to vacate his convictions, and to order a new trial: whether disclosure of a witness' falsity to defense counsel satisfies a prosecutor's duty under *Napue* and *Giglio* to correct a witness' false testimony is a

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

336 Conn. 168　　FEBRUARY, 2021　　169

Gomez *v.* Commissioner of Correction

case specific determination to be made in view of certain factors, including whether the prosecutor or the defense elicits the false testimony, whether and how the prosecutor adopts and uses the false testimony, the importance of the witness and his or her false testimony to the state's case, whether and to what effect defense counsel tries to impeach the witness or whether counsel has a clear tactical reason for not doing so, and whether the truth ultimately is revealed to the jury; considering the relevant factors in light of the record, this court determined that defense counsel's actual or constructive notice of the cooperation agreements was insufficient to satisfy the prosecutor's obligations under *Napue* and *Giglio*, as the prosecutor directly solicited the false testimony of S and V, who were the state's key witnesses, defense counsel attempted to elicit the details and results of any cooperation agreements on cross-examination but was met with further denials by S and V, and the prosecutor not only failed to correct the false testimony during closing argument but also affirmatively vouched for the credibility of V and invited the jury to decide the case on the basis of V's credibility; moreover, the respondent, the Commissioner of Correction, conceded that the violation of the petitioner's due process rights was material because the state's case against him was not overwhelming without the testimony of S and V.

(*One justice concurring separately*)

Argued October 23, 2019—officially released June 29, 2020**

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to the Appellate Court, *Lavine, Kahn* and *Bishop, Js.*, which affirmed the judgment of the habeas court, and the petitioner, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*Andrew P. O'Shea*, assigned counsel, for the appellant (petitioner).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*,

** June 29, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Gomez *v.* Commissioner of Correction

state's attorney, and *Stephen M. Carney* and *Theresa Anne Ferryman,* senior assistant state's attorneys, for the appellee (respondent).

*Opinion*

VERTEFEUILLE, J. The dispositive question presented by this certified appeal is whether a criminal defendant's federal due process rights[1] are violated when the state knowingly fails to correct the material, false testimony of a prosecution witness when defense counsel had actual or constructive notice that the testimony is false. We conclude that, under the circumstances of the present case, the fact that defense counsel was aware of the falsity of the testimony of two cooperating witnesses was not sufficient to protect the rights of the petitioner, Jamie Gomez, to due process of the law. Accordingly, we reverse the judgment of the Appellate Court, which affirmed the judgment of the habeas court denying the petitioner's second petition for a writ of habeas corpus.

I

The facts and procedural history of the case are set forth in full in the decision of the Appellate Court that is under review; *Gomez* v. *Commissioner of Correction,* 178 Conn. App. 519, 522–24, 176 A.3d 559 (2017); and in the decision of this court resolving the direct appeals of the petitioner and his codefendants, Anthony Booth and Daniel Brown (codefendants). *State* v. *Booth,* 250 Conn. 611, 614–16, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut,* 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). The following summary provides the necessary context for the present appeal.

[1] The petitioner has abandoned any argument that the constitution of Connecticut affords broader protection than does the United States constitution in this respect. *Gomez* v. *Commissioner of Correction,* 178 Conn. App. 519, 522 n.1, 176 A.3d 559 (2017).

Gomez *v.* Commissioner of Correction

"In connection with the murder of Darrell Wattley, the state charged the petitioner and his codefendants . . . each with [inter alia] one count of murder in violation of General Statutes § 53a-54a . . . and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a.'' *Gomez* v. *Commissioner of Correction*, supra, 178 Conn. App. 522. During the consolidated trial in 1997, John F. Cocheo, who passed away before the present action was filed, represented the petitioner, Jeremiah Donovan represented Brown, and Bruce Sturman represented Booth. Id., 524. The state's key witnesses at trial were two other alleged coconspirators, Angeline Valentin and James "Tiny" Smith (witnesses). Id., 523, 529–31.

Valentin testified to the following at trial. The codefendants were members of the 20-Love street gang and resided in the same New London apartment complex as did Valentin. On the evening of the murder, Valentin notified the codefendants and Smith that Wattley, who had romantic feelings for her, was coming to visit her. She understood, on the basis of previous conversations, that the codefendants planned to assault Wattley when he visited their apartment complex in retaliation for a prior incident in which Wattley had assaulted Smith. A short time later, Valentin heard gunshots in the building, looked out her window, and saw the codefendants and Smith run quickly out of the building, enter a car owned by the petitioner's girlfriend, and drive off with the petitioner in the driver's seat. Approximately thirty minutes later, she went downstairs and saw Wattley lying on the floor with "[b]lood draining from his head.'' Finally, she testified that, later that evening, Booth "told [her] what [had] happened. And he told [her] that, if [she] would have known that they [were] going to kill [Wattley], [she] would have never helped . . . by telling [the codefendants and Smith] that he was coming over.''

Gomez *v.* Commissioner of Correction

Valentin further testified that Booth admitted ''that they shot him.''

In his trial testimony, Smith confirmed both that the codefendants were affiliated with 20-Love and that Wattley had assaulted him at a party the week before the murder. Although his account of events differed slightly from that of Valentin, he confirmed that a ''girl'' had alerted the codefendants that Wattley was coming to visit her and that the codefendants had indicated that they wanted Smith to fight Wattley when Wattley arrived.

Smith further testified as follows. While the men were waiting for Wattley to arrive, Booth, in reference to a bag that Brown was holding, asked, ''did [you] wear gloves when [you] loaded it,'' to which Brown responded ''yes.'' The four men then left the apartment, several of them having donned gloves, and with Booth wielding a butcher knife, but Smith remained under the impression that only a fistfight was planned. The group then split; Smith accompanied Booth to one side of the building, and Brown accompanied the petitioner to the other side. Smith saw Wattley arrive and enter the building on the side where Brown and the petitioner were waiting. Smith then heard gunshots and, after running through the building with Brown, came across Wattley lying on the ground, covered in blood but still moving his legs. Smith watched Booth stab Wattley several times, after which the two men fled, joining Brown and the petitioner at the petitioner's car. During the ensuing car ride, Brown said, ''I robbed that nigger, too,'' and threw a knife out of the window. Booth then instructed the group to invent alibis, which they later did.[2]

The jury found the petitioner and his codefendants guilty of murder and conspiracy to commit murder. Id.,

_____

[2] In part II of this opinion, we set forth the facts and procedural history regarding the trial testimony of Valentin and Smith that the state had made them no promises, and that they had received no benefits, in return for their cooperation.

524. The trial court, *Parker, J.*, "sentenced the petitioner to a term of imprisonment of fifty years on the murder count and a concurrent sentence of fifteen years on the conspiracy to commit murder count, for a total effective sentence of fifty years . . . ." Id. This court affirmed the petitioner's conviction. *State* v. *Booth*, supra, 250 Conn. 617.

In 2000, the petitioner, represented by Robert McKay, filed his first petition for a writ of habeas corpus. The habeas court, *Rittenband, J.*, denied the petition.

In 2013, the petitioner filed a second petition for a writ of habeas corpus. In his amended petition, which gives rise to the present appeal, he alleged, among other things, that his prior habeas counsel had provided ineffective assistance insofar as he failed to raise the claim that the state had violated his right to due process when the prosecutor failed to correct the allegedly false testimony of Valentin and Smith at trial. The habeas court, *Oliver, J.*, denied the petition. With respect to the petitioner's due process claim, the court found that "[t]he petitioner . . . failed to demonstrate that the underlying trial testimony of Smith and Valentin was 'false' . . . as opposed to, for example, [a reflection of] their uncertainty as to the likely posttrial sentencing scenario." The court also found that "[t]he nature and circumstances of [Smith's] and Valentin's 'agreements' were thoroughly explored and dissected on both direct and cross-examination. There is no reasonable probability that the jury was misled in this regard . . . ." Finally, the court found that "at least one other defense attorney in the consolidated trial was . . . aware of the agreement" by which the prosecuting authority would bring the cooperation of Smith and Valentin to the attention of the sentencing judge posttrial and, therefore, concluded that the petitioner had failed to demonstrate that Cocheo was unaware of the existence of that agreement. For these reasons, the court concluded that there

Gomez *v.* Commissioner of Correction

had been no due process violation and, therefore, that prior counsel had not performed deficiently in failing to raise the claim.

The habeas court subsequently granted the petitioner's petition for certification to appeal, and the Appellate Court affirmed the judgment. *Gomez* v. *Commissioner of Correction*, supra, 178 Conn. App. 522. The Appellate Court concluded that, in light of the clear and undisputed evidence of the agreements, the habeas court's finding that "the state had limited agreements to bring the cooperation of Valentin and Smith to the attention of the trial court posttrial . . . was not clearly erroneous." Id., 535. The Appellate Court also concluded, however, that there had been no violation of the petitioner's due process rights, as elucidated in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), because the agreements had been disclosed to defense counsel. Id., 540. The Appellate Court read this court's decision in *State* v. *Ouellette*, 295 Conn. 173, 186–87, 989 A.2d 1048 (2010), to mean that *Napue* and *Giglio* are concerned only with the state's failure to correct false testimony regarding an *undisclosed* cooperation agreement. See *Gomez* v. *Commissioner of Correction*, supra, 539–40; see also *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 726–28, 138 A.3d 430 (2016). This certified appeal followed.[3]

---

[3] We granted certification, limited to the following issues: (1) "Did the Appellate Court properly reject the petitioner's claim that his due process rights were violated because the state knowingly presented false testimony during his criminal trial?" And (2) "Did the Appellate Court [correctly] determine that the petitioner's right to the effective assistance of counsel was not violated by virtue of his trial counsel's failure to cross-examine certain state's witnesses about consideration that those witnesses had been promised by the state in return for their testimony?" *Gomez* v. *Commissioner of Correction*, 328 Conn. 916, 180 A.3d 962 (2018). In light of the record and the parties' arguments, the first issue may be more accurately framed as follows: Did the Appellate Court properly reject the petitioner's claim that his due process rights were violated because the state knowingly failed to

Gomez *v.* Commissioner of Correction

II

On appeal, the petitioner contends that both Smith and Valentin provided material, false or misleading testimony and that the fact that defense counsel had actual or constructive notice thereof did not satisfy the duty of the prosecutor, under *Napue* and *Giglio*, to correct the witnesses' false testimony. We agree.

A

The following legal principles frame our review of the petitioner's claim. "Whether a prosecutor knowingly presented false or misleading testimony [in violation of a defendant's due process rights] presents a mixed question of law and fact, with the habeas court's factual findings subject to review for clear error and the legal conclusions that the court drew from those facts subject to de novo review." *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 14, 190 A.3d 851 (2018), cert. denied sub nom. *Greene* v. *Semple*, U.S. , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019).

"[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require the prosecutor to apprise the court when he or she knows that the witness is giving testimony that is substantially misleading." (Citations omitted; internal quotation marks omitted.) Id., 15.

correct false testimony during his criminal trial? See, e.g., *State* v. *A. M.*, 324 Conn. 190, 200, 152 A.3d 49 (2016) (court may restate certified question). Because we answer that question in the negative, we need not reach the second certified issue.

Gomez *v.* Commissioner of Correction

B

To establish a *Napue/Giglio* violation, then, the petitioner must demonstrate that the state's witnesses provided material, false or substantially misleading testimony that the prosecutor failed to correct. To reiterate, the petitioner in the present case contends that both witnesses falsely testified at trial that (1) the state had not promised them anything in return for their cooperation, and (2) they did not receive any benefit at their respective bond hearings in exchange for cooperating.[4]

With respect to the first contention, the decision of the Appellate Court sets forth in full the testimony on which that court concluded that both witnesses falsely testified that the state had promised them nothing in exchange for their cooperation, when, in fact, the prosecutor, Paul E. Murray, had promised both witnesses that he would bring their cooperation to the attention of the sentencing court. See *Gomez* v. *Commissioner of Correction*, supra, 178 Conn. App. 529–38 and n.10; id., 538–39 n.13. We need not revisit either that evidence or the Appellate Court's conclusion, however, because the respondent, the Commissioner of Correction, to his credit, concedes before this court that both witnesses provided materially false testimony in this regard.

With respect to the second contention, we conclude that the habeas court's finding that Valentin received no benefits in exchange for her cooperation was clearly erroneous.[5] At trial, the following exchange took place during Donovan's cross-examination of Valentin:

---

[4] The parties do not dispute that the prosecutor, Murray—who represented the state both at the petitioner's and his codefendants' consolidated criminal trial and in connection with the criminal proceedings against Valentin and Smith—did not correct any of the witnesses' allegedly false testimony. They also do not dispute that any representations by the state's witnesses that they had received no benefits in exchange for their cooperation with the state were material to the jury's assessment of their credibility. See *Napue* v. *Illinois*, supra, 360 U.S. 269.

[5] Although there is reason to believe that Smith also provided false testimony in this regard, the evidence that his testimony regarding his bond

336 Conn. 168        FEBRUARY, 2021                177

Gomez *v.* Commissioner of Correction

"[Donovan]: After you testified against . . . Booth, you were released from jail, weren't you?

"[Valentin]: Yes, I was.

"[Donovan]: Do you think there might be, there just might be, some connection between [your] testifying against . . . Booth and your not being in jail anymore?

"[Valentin]: No.

"[Donovan]: You don't see any connection at all?

"[Valentin]: (Witness nods in the negative.)"

The transcript of Valentin's bond hearing, however, flatly belies her testimony that there was no connection between her cooperation and the fact that she made bail. The hearing began with Murray's informing the court of the scope and importance of Valentin's cooperation: "We have multiple, sworn statements from her, Your Honor, and she did testify at length and, we believe, truthfully at the probable cause hearing for . . . Booth, and was instrumental in a finding of probable cause for . . . Booth." In his argument to the court at the bond hearing, Valentin's attorney, Bernard W. Steadman, then repeatedly emphasized the significance and extent of his client's cooperation.[6] Finally, in making his bond recommendation to the court, Murray stated: "I did indicate to . . . Steadman, Your Honor, that I would bring to the court's attention her cooperation, and I think I've done that. . . . I also think she should be aware that, if she [is permitted to move to New Jersey

hearing was false or substantially misleading is not sufficiently compelling for us to conclude that the contrary finding of the habeas court was clearly erroneous.

[6] He argued as follows: "[We have] a young lady who is and has been very cooperative with the state. . . . [T]his is a young lady who has impressed me quite a bit as being . . . a person who would cooperate with the court and with the state in every aspect. . . . I would ask the court to consider, in light of her cooperation, in light of her intention to cooperate in the future, to consider releasing her on a promise to appear."

Gomez *v.* Commissioner of Correction

and does not remain available], and if the state has to go and seek her out . . . she will have forfeited whatever benefits she has gained from her cooperation to this point. . . . [S]o . . . she would be in serious trouble should she not cooperate and be available. Having said that, Your Honor, I'm not sure whether a promise to appear is the appropriate thing, but I think certainly a substantial reduction in her bond is appropriate. . . . I think . . . if I were in your position, I would be considering a written promise to appear. . . . I would not be averse to a written promise to appear.''

Consistent with the state's suggestion, the court ultimately reduced Valentin's bond from $100,000 to a written promise to appear and allowed her to move from Connecticut to New Jersey, despite the pending charge of accessory to assault in the first degree. In explaining that decision, the court stated: ''[C]onsidering all of the factors . . . [and] the information relayed by counsel, particularly taking into consideration the youth and cooperative aspects of this matter, I'm going to . . . reduce the bond . . . .'' In light of the multiple references to Valentin's cooperation in the course of what was a relatively brief hearing, including Murray's statement implying that Valentin had gained benefits from her cooperation, we do not think any reasonable conclusion may be drawn other than that her trial testimony that there was no possible connection between her cooperation and her release from jail was false.[7]

---

[7] The respondent points to the fact that Murray, having made this record and all but recommended that the court release Valentin on a written promise to appear in exchange for her cooperation, later, at the bond hearing, attempted to blunt the anticipated ''obvious cross-examination effect'' of his prior statements by emphasizing that no representations had been made to Valentin other than that her cooperation would be brought to the attention of the sentencing court. Neither that fact, nor the court's ultimate acknowledgement that Valentin's youth was the main factor on which it relied, alters our conclusion regarding the veracity of Valentin's trial testimony.

Gomez *v.* Commissioner of Correction

C

As we have discussed, the respondent does not dispute that the witnesses provided material, false testimony that the state failed to correct, at least insofar as both Valentin and Smith testified that the state had promised them no benefit in exchange for their cooperation in the petitioner's case. Nevertheless, the respondent contends that the petitioner's *Napue/Giglio* rights were not violated because, in *State* v. *Ouellette*, supra, 295 Conn. 173, this court indicated that due process does not require the prosecutor to correct a witness' false or misleading testimony regarding a cooperation agreement when the agreement at issue has been disclosed to defense counsel. Because the state's agreements with Smith and Valentin had been disclosed to Donovan, and because Cocheo had access to the transcripts of both witnesses' bond hearings, the respondent claims the petitioner, through his counsel, had at least constructive notice as to the misleading nature of the witnesses' testimony.[8] The petitioner, relying on case law from certain federal courts of appeals, responds, and we agree, that disclosure to defense counsel does not necessarily satisfy the prosecutor's obligations under *Napue/Giglio*.

1

Before we consider the split of opinion among the federal courts of appeals on this question, we first address the respondent's argument that this court already resolved the question in *Ouellette*. In that case, the defendant, Daniel J. Ouellette, was convicted of robbery and related crimes, largely on the basis of the testimony of his alleged coconspirator, Pamela Levesque. Id., 176–80. Levesque testified at trial that she had entered into a plea agreement pursuant to

_____

[8] Because we conclude that even direct disclosure to defense counsel does not necessarily cure a *Napue/Giglio* violation, we need not address the dispute between the parties as to whether constructive notice to defense counsel constitutes disclosure for purposes of those cases.

Gomez *v.* Commissioner of Correction

which the state had agreed to recommend a sentence of twenty years imprisonment, execution suspended after ten years, in exchange for her cooperation. Id., 178–79. At Levesque's sentencing hearing following Ouellette's conviction, however, the state's attorney appeared to invite the court to impose a more lenient sentence, which the court did. Id., 180.

In his direct appeal, Ouellette claimed that the state's departure from the terms of the agreement to which Levesque had testified suggested that the state had withheld evidence of a different, more favorable plea agreement with the witness, in violation of his due process rights. Id., 181. In assessing this argument, this court evaluated Ouellette's claim through the lens of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), in which the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., 87. We stated that "[t]he Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Napue* . . . and *Giglio* . . . ." (Citations omitted.) *State* v. *Ouellette*, supra, 295 Conn. 185–86. "The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases," we further suggested, "is the existence of an *undisclosed* agreement or understanding between the cooperating witness and the state." (Emphasis added.) Id., 186. In other words, we assumed in *Ouellette* that both *Napue* and *Giglio* fell within the *Brady* line of cases and that those cases were principally concerned, as was *Brady*, with the *suppression* of evidence favorable to a criminal defendant. Because there was no evidence that Levesque had entered into an *undisclosed* plea agreement with the state, we upheld Ouellette's conviction. Id., 187–92.

Gomez *v.* Commissioner of Correction

On further reflection, it is clear that we painted with an overly broad brush in *Ouellette*. *Napue* was decided four years *prior* to *Brady*, and *Brady* relied on *Napue* rather than the other way around. See *Brady* v. *Maryland*, supra, 373 U.S. 87. Moreover, nowhere in *Napue* did the United States Supreme Court address the question of whether or not the cooperation agreement at issue had been disclosed to defense counsel. Rather, the court's concern was with the long established principle that "a conviction obtained through use of false evidence, known to be such by representatives of the [s]tate, must fall under the [f]ourteenth [a]mendment . . . ." *Napue* v. *Illinois*, supra, 360 U.S. 269. The court articulated the rationale for its holding as follows: "The principle that a [s]tate may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, [is] implicit in any concept of ordered liberty . . . ." Id.

*Giglio*, by contrast, was decided subsequent to *Brady* and relied on both that case and on *Napue*. See *Giglio* v. *United States*, supra, 405 U.S. 151. As in *Napue*, the United States Supreme Court in *Giglio* appeared to be concerned primarily with the damage done to due process when the state obtains a criminal conviction on the basis of testimony known to be false. See id., 153 ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice" (internal quotation marks omitted)). Although it is true that the high court in *Giglio* also expressed some concern that the cooperation agreement at issue had not been disclosed, the court appeared to be concerned primarily that the agreement had not been disclosed "to the *jury*"; (emphasis added) id.; rather than to defense counsel. See *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 543–44 and n.30, 193 A.3d 625 (2018) (explaining that, although *Brady* was concerned primarily with dis-

Gomez *v.* Commissioner of Correction

closure of exculpatory material to defendant, essence of *Napue/Giglio* violation is lack of disclosure of truth to jury).

The teaching of these cases, then, is that the state's knowing presentation of false testimony regarding the benefits that have been afforded to a cooperating witness may implicate two related but distinct rights protected by the due process clause of the fourteenth amendment. First, under *Brady* and its progeny, the state may not suppress material, exculpatory evidence, including evidence that tends to undermine the credibility of the state's witnesses. Second, under *Napue* and its progeny, the state may not knowingly rely on the presentation of false or substantially misleading evidence to the jury, including evidence regarding the benefits that have been afforded to cooperating witnesses, to obtain a criminal conviction. To the extent that *Ouellette* concerned itself solely with the rights secured under *Brady*, our analysis in that decision was incomplete.[9] See, e.g., *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 592–93, 198 A.3d 562 (2019) (failure to correct false testimony of cooperating witness is ''an additional due process violation'' to failure to disclose under *Brady*); see also, e.g., *Long* v. *Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (*Napue* and *Brady* are ''cousin[s]'' representing distinct manifestations of principle that prosecutors must expose material weaknesses in their cases), cert. denied,

---

[9] We recognize that, in several subsequent cases, the United States Supreme Court has discussed *Napue* violations under the general moniker of ''*Brady*.'' In those cases, however, that court has continued to distinguish *Napue*-type violations, in which the state relies on the presentation of false evidence to obtain a conviction, from true *Brady* cases. See, e.g., *United States* v. *Bagley*, 473 U.S. 667, 678–81 and n.11, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *United States* v. *Agurs*, 427 U.S. 97, 103–107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); see also K. Grunewald, Case Note, ''*Bramblett* v. *True*, No. 02-3, 2003 WL 58283, at *1 (4th Cir. Jan. 8, 2003),'' 15 Cap. Def. J. 537, 547 (2003) (''*Napue* and *Brady* claims are distinctly different and require separate analysis'').

Gomez *v.* Commissioner of Correction

U.S. , 138 S. Ct. 1593, 200 L. Ed. 2d 777 (2018); T. Murphy, ''Futility of Exhaustion: Why *Brady* Claims Should Trump Federal Exhaustion Requirements,'' 47 U. Mich. J.L. Reform 697, 706 (2014) (unlike *Brady*, ''[t]he harm associated with a *Napue* violation is not limited to a specific defendant, but instead undermines the credibility of the criminal justice system as a whole''); cf. *Greene* v. *Commissioner of Correction*, supra, 330 Conn. 34 n.1, 39 (*D'Auria, J.*, concurring) (*Ouellette* does not necessarily govern situations in which witness clearly has testified falsely or committed perjury).

2

We turn, then, to the dispositive question presented by this appeal, namely, whether due process is offended if the state knowingly presents the false testimony of a cooperating witness regarding the details of a cooperation agreement but also discloses the truth regarding that agreement to defense counsel. It is evident that disclosure to defense counsel resolves any pure *Brady*-type concerns. Because *suppression* of material evidence is the sine qua non of a *Brady* violation, *disclosure* of that evidence necessarily secures a defendant's *Brady* rights. It then falls to the defendant, in consultation with counsel, to decide what use, if any, to make of the disclosed evidence.

It is less obvious, however, that disclosure to counsel—whether direct or constructive—is sufficient to secure a defendant's rights under *Napue* and *Giglio*. The fact that a defendant knows that the state is attempting to secure his conviction on the basis of false evidence does not necessarily discharge the prosecutor from his duty to correct the false testimony or immunize the state from a claim that the defendant's right to due process was violated.

The respondent contends that the overwhelming weight of federal precedent holds that the prosecutor

Gomez *v.* Commissioner of Correction

can, in fact, discharge his or her responsibility to correct false testimony under *Napue* and *Giglio* simply by providing defense counsel with the correct information prior to the end of trial. Our own review of the federal cases suggests that the jurisprudence is more fragmented than the respondent allows.

The federal courts of appeals that have addressed this issue appear to break down into five different camps. At one extreme are those courts that hold that disclosure of the facts of a cooperation agreement to defense counsel always is sufficient to protect a defendant's rights under *Napue.* If defense counsel opts to impeach the state's witness as to the falsehood, the jury is made aware of the truth; if defense counsel declines to cross examine the witness regarding the falsehood, that choice is deemed to be strategic and, therefore, a waiver of any *Napue* claim. See, e.g., *United States* v. *Flores-Rivera,* 787 F.3d 1, 31–32 (1st Cir. 2015); *United States* v. *Meinster,* 619 F.2d 1041, 1045–46 and n.8 (4th Cir. 1980). Other federal courts, while generally taking the view that disclosure is sufficient to satisfy *Napue,* make an exception for cases in which the prosecutor becomes complicit in the falsehood, such as by adopting or otherwise affirmatively capitalizing on a witness' false testimony. See, e.g., *United States* v. *Stein,* 846 F.3d 1135, 1147–48 (11th Cir.), cert. denied, U.S. , 138 S. Ct. 556, 199 L. Ed. 2d 436 (2017); *United States* v. *Barham,* 595 F.2d 231, 243–44 n.17 (5th Cir. 1979). Still others make exception for cases in which defense counsel is prevented from effectively impeaching the witness or when other unusual factors apply. See, e.g., *United States* v. *Iverson,* 648 F.2d 737, 738–39 and n.8 (D.C. Cir. 1981) (Harold, J.) (statement on order denying petition for rehearing); *United States* v. *Harris,* 498 F.2d 1164, 1166, 1169–71 (3d Cir.), cert. denied sub nom. *Young* v. *United States,* 419 U.S. 1069, 95 S. Ct. 655, 42 L. Ed. 2d 665 (1974).

Gomez *v.* Commissioner of Correction

At the other end of the spectrum are those courts of appeals holding that the prosecutor remains under a continuing duty to correct the false testimony of the state's witnesses and that the failure to do so violates *Napue*, regardless of whether defense counsel has been made aware of the falsehood. See, e.g., *United States* v. *LaPage*, 231 F.3d 488, 491–92 (9th Cir. 2000) (finding *Napue* violation even when prosecutor attempted to correct false testimony during rebuttal argument); *United States* v. *Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (finding *Napue* violation, even though defense counsel was aware of letters containing government's promises to witnesses). Not surprisingly, it is on such authorities that the petitioner invites us to rely.

Two other courts, the United States Courts of Appeals for the Second and Seventh Circuits, have carved out a middle path between these extremes. See, e.g., *Long* v. *Pfister*, supra, 874 F.3d 544; *Jenkins* v. *Artuz*, 294 F.3d 284 (2d Cir. 2002). These courts consider various factors in assessing whether the state has satisfied its obligations under *Napue* merely by disclosing to defense counsel that a witness for the prosecution has given material, false testimony. Those factors include whether it is the prosecution or the defense that elicits the false testimony, whether and how the prosecutor adopts and uses the false testimony, the importance of the witness and his or her false testimony to the state's case, whether—and to what effect—defense counsel tries to impeach the perfidious witness or whether counsel has a clear tactical reason for not doing so, and, most important, whether the truth ultimately is revealed to the jury. See *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 546–54; see also *Long* v. *Pfister*, supra, 548; *Jenkins* v. *Artuz*, supra, 294–95.

Beyond the fact that we give great weight to the decisions of the Second Circuit in interpreting the federal constitution; e.g., *State* v. *Faria*, 254 Conn. 613,

Gomez *v.* Commissioner of Correction

625 n.12, 758 A.2d 348 (2000); we are persuaded, for
several reasons, that the more nuanced approach fol-
lowed by the Second and Seventh Circuits is the correct
one. The rule advocated by the respondent, namely,
that disclosure to defense counsel either conclusively
or presumptively satisfies *Napue*, is simply incompati-
ble on its face with the principles that the United States
Supreme Court articulated in that case. As we have dis-
cussed, in *Napue*, the high court was principally con-
cerned not with the harms that flow from the suppres-
sion of exculpatory evidence but, rather, with the more
fundamental insult to due process when the state know-
ingly attempts to secure the conviction of a criminal
defendant on the basis of falsehoods and fabrications.
The court stated the rule in no uncertain terms: "[I]t is
established that a conviction obtained through use of
false evidence, known to be such by representatives of
the [s]tate, *must fall* under the [f]ourteenth [a]mend-
ment . . . ." (Emphasis added.) *Napue* v. *Illinois*,
supra, 360 U.S. 269; see also *United States* v. *Agurs*,
427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)
("the [United States Supreme] Court has consistently
held that a conviction obtained by the knowing use of
perjured testimony is fundamentally unfair, and must
be set aside if there is any reasonable likelihood that
the false testimony could have affected the judgment
of the jury" (footnote omitted)); *Long* v. *Pfister*, supra,
874 F.3d 554–55 (Hamilton, J., dissenting) ("If mere
disclosure of the perjury to the defense were enough,
as it is under *Brady* . . . the logic of the rule would
allow the prosecution to disclose the perjury and just
stand aside while the defense tries to rebut it. That is
simply not a reasonable reading of *Napue* . . . .").

To hold otherwise would be to condone, if not
encourage, unethical and unprofessional conduct on
the part of the prosecutor. See, e.g., *Jenkins* v. *Artuz*,
supra, 294 F.3d 296 n.2. "It is well established that [a]

prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . [B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 810–11, 699 A.2d 901 (1997); see also *United States* v. *LaPage*, supra, 231 F.3d 492 (''A prosecutor has a special duty commensurate with a prosecutor's unique power, to [en]sure that defendants receive fair trials. It is as much his [or her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one.'' (Internal quotation marks omitted.)); Rules of Professional Conduct 3.8, commentary (''A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.''). These duties are in addition to the duties of every attorney, as an officer of the court (1) not to offer material evidence that the attorney knows to be false, and (2) if a witness called by the attorney offers false testimony, to disclose that fact to the tribunal if necessary to avoid misleading the trier of fact. Rules of Professional Conduct 3.3 (3); Rules of Professional Conduct 3.3, commentary.

We also are in agreement with those courts that have concluded that merely disclosing to defense counsel that a state's witness has misrepresented the terms of

Gomez *v.* Commissioner of Correction

a cooperation agreement is not always sufficient to discharge a prosecutor's duties under *Napue*. That is true because sharing the truth with defense counsel, in itself, does nothing to disabuse the jury of any misconceptions created by the false testimony. See *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 604–605.

Of course, defense counsel shares an obligation to ensure that a criminal trial is not tainted by evidence that falsely incriminates the defendant, and the failure to attempt to purge that taint may be the basis for an ineffective assistance of counsel claim. The trial court also can, and should, take any necessary remedial measures, such as requiring the parties to clarify the nature of any cooperation agreement on the record and instructing the jury accordingly. See id., 607–608.

Ultimately, however, it is the prosecutor who is best positioned to repair the damage that is done to "the efficient and fair administration of justice"; id., 605; when a state's witness provides false testimony. In the face of silence—or worse, complicity—on the part of the prosecution and continued dissembling by the state's witness, there is no reason to believe that defense counsel will have any greater success in persuading the jury that the witness has been promised benefits in exchange for his or her testimony than, for instance, that he or she is the true perpetrator. As the United States Court of Appeals for the Ninth Circuit explained in *LaPage*, "[a]ll perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain this pollution of the trial. The jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism." (Footnote omitted.) *United States* v. *LaPage*, supra, 231 F.3d 492; see also *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 551 ("any knowledge by the court or defense counsel through disclosure of a plea

Gomez *v.* Commissioner of Correction

agreement can be thwarted by the prosecutor's examination of a witness or closing arguments''); *Jenkins* v. *Artuz*, supra, 294 F.3d 293–96 (''tepid concession'' by witness during cross-examination was insufficient to cure impact of false testimony on jury, especially when prosecutor sought to shore up witness' credibility); *United States* v. *Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (''[t]he defendant gains nothing . . . by knowing that the [g]overnment's witness has a personal interest in testifying unless he is able to impart that knowledge to the jury''); A. Poulin, ''Convictions Based on Lies: Defining Due Process Protection,'' 116 Penn St. L. Rev. 331, 388 (2011) (''Defense awareness of the falsity should not necessarily defeat a due process claim. If the defense was unable to air the issue for the jury despite awareness of the falsity, the defendant's right to due process has been violated.'').

Accordingly, although the burden is one shared by defense counsel and the trial court, the onus ultimately is on the prosecutor to not knowingly seek a conviction on the basis of false testimony and, should a state's witness testify falsely, to take such remedial measures before the jury retires as are necessary to ensure that it is not deceived. See *Sivak* v. *Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) (defendant cannot ''waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system'' (internal quotation marks omitted)). The record may be corrected by, inter alia, recalling the cooperating witness and asking leading questions to draw out the true nature of the plea agreement.[10] *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 607.

[10] To its credit, following our decision in *Marquez*, the Division of Criminal Justice voluntarily adopted a new policy, entitled ''515 Cooperating Witnesses,'' that is intended to ensure the vindication of defendants' rights under *Napue* and *Brady*. Of particular relevance to the present appeal, the policy provides: ''The prosecutorial official trying the case shall ensure that any testimony that is given by the cooperating witness concerning the

Gomez *v.* Commissioner of Correction

At the same time, we are not persuaded that we should adopt the approach followed by the Eighth and Ninth Circuits, namely, that disclosure to defense counsel, standing alone, is never sufficient to satisfy a prosecutor's *Napue* obligations. Because we have said that the preeminent consideration ultimately is whether the jury has been misled regarding the motivations of a cooperating witness to falsely implicate a defendant; see *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990), overruled in part on other grounds by *State* v. *Skakel*, 276 Conn. 633, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); we agree with the Second and Seventh Circuits that the analysis must be case specific in view of the factors that we have discussed. We do agree with the Eighth and Ninth Circuits, however, that it will be the unusual case in which the prosecutor fails to correct material, misleading testimony regarding the existence of a cooperation agreement and a reviewing court can, nevertheless, determine with confidence that the jury was not misled thereby.

3

Our own review of the record; see *Napue* v. *Illinois*, supra, 360 U.S. 271–72; persuades us that the present matter does not fall within those exceptional cases in which disclosure to defense counsel, standing alone, is sufficient to satisfy a prosecutor's obligations and to vindicate a defendant's rights under *Napue*. In the present case, during his direct examination, Murray directly solicited false testimony from both witnesses regarding their cooperation agreements with the state.[11] On cross-

---

cooperation agreement is true, accurate and not misleading. False, inaccurate or misleading testimony may be corrected with the use of leading questions, as permitted by the trial court."

[11] The following exchange occurred between Murray and Valentin:

"[Murray]: Has anybody promised you anything?

"[Valentin]: No."

The following exchange occurred between Murray and Smith:

"[Murray]: Do you have any idea what's going to happen in the criminal charges against you?

"[Smith]: No, I don't.

Gomez *v.* Commissioner of Correction

examination, the defense team questioned both wit-
nesses at some length on this point in an attempt to
extract admissions that the state had promised or pro-
vided them some consideration in exchange for their
testimony. Both witnesses doubled down on their dir-
ect testimony, responding that they had neither been
offered nor had they received benefits in exchange for
their testimony. Finally, in his closing argument, not
only did Murray not correct the witnesses' misstate-
ments, but he affirmatively vouched for Valentin's credi-
bility and invited the jury to decide the case on the basis
thereof. Acknowledging that Valentin had admitted to
lying to the police shortly after the crime, he declared
"[t]hat's the only lie that's been shown with respect to
. . . Valentin."

Moreover, regardless of whether the defense team
should have obtained transcripts of the witnesses' bond
hearings by the time of trial and been fully aware of the
benefits that they had obtained in exchange for their
cooperation, it is undisputed that they did not do so,
and, therefore, that they were unable to effectively elicit
that information and impeach the witnesses' credibility
before the jury. As we have explained, the ultimate
question under *Napue* is not whether defense counsel or
the trial court did all it could to protect the defendant's
rights to a fair trial but, rather, whether the prosecutor
knowingly permitted the jury to be misled and the defen-
dant to be convicted on the basis of false testimony.

In light of the facts that the prosecutor directly solic-
ited the false testimony of the state's two key witnesses,
that defense counsel tried in good faith to elicit the
details and results of any cooperation agreements but

"[Murray]: Did anybody promise you anything?

"[Smith]: No.

* * *

"[Murray]: Did anybody promise you anything in return for [your]
statement?

"[Smith]: No, no."

Gomez *v.* Commissioner of Correction

was met with further denials, and that the prosecutor closed by vouching for the credibility of one of those witnesses in his rebuttal argument, we are not persuaded that defense counsel's actual or constructive knowledge of the truth was sufficient to satisfy *Napue*. See *Jenkins* v. *Artuz*, supra, 294 F.3d 296 (discussing challenges that defense counsel faces "[w]hen a prosecutor throws his or her weight behind a falsely testifying witness"). We need not tarry long on the second, materiality, prong of *Napue*, in light of the respondent's commendable concession; see *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 368 n.13, 71 A.3d 512 (2013); that a violation of the petitioner's due process rights would be material because the state's case against the petitioner was not overwhelming without the testimony of Smith and Valentin.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the habeas court and to remand the case to that court with direction to grant the habeas petition, to vacate the petitioner's underlying convictions, and to order a new trial.

In this opinion the other justices concurred.

ROBINSON, C. J., concurring. I join the well reasoned opinion of the majority concluding that the petitioner, Jamie Gomez, was entitled to the granting of his petition for a writ of habeas corpus because his federal due process rights were violated under *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), when the prosecutor at his murder trial failed to correct the material, false testimony of two cooperating prosecution witnesses, despite the fact that the petitioner's defense attorney was at least constructively aware that the testimony was false. I

Gomez *v.* Commissioner of Correction

agree with the majority's conclusion that the trial prose-
cutor's actions in this case constituted an extraordinary
breach of his obligations as a minister of justice with
ethical responsibilities to the public and the judicial sys-
tem that transcend seeking convictions at all costs.
See, e.g., *State* v. *Medrano*, 308 Conn. 604, 612, 65 A.3d
503 (2013).

Specifically, as the majority notes, the trial prosecu-
tor directly solicited testimony that was false and mis-
leading in nature regarding the witnesses' cooperation
agreements with the state and did nothing to address
that false testimony, which the witnesses then repeated
during cross examination. The trial prosecutor then
effectively vouched for their credibility during summa-
tions. I emphasize that sanctioning this parade of falsity
has at a minimum the appearance of a dereliction of
the prosecutor's ethical duty "to ensure that all evidence
tending to aid in the ascertaining of the truth be laid
before the court, whether it be consistent with the con-
tention of the prosecution that the accused is guilty."
(Internal quotation marks omitted.) *Massameno* v.
*Statewide Grievance Committee*, 234 Conn. 539, 557,
663 A.2d 317 (1995). I write separately to commend (1)
the Division of Criminal Justice, at an institutional level,
for adopting a comprehensive policy recognizing its
prosecutors' obligations to ensure the accuracy of coop-
erating witnesses' testimony and to correct any false-
hoods,[1] and (2) the appellate prosecutor for discharging
his obligation as a minister of justice on behalf of the
state and paving the way for habeas relief by candidly
conceding the materiality and falsity of the witnesses'
testimony. Given that concession and the severity of
the *Napue/Giglio* violation in this case, I join in the
judgment of the majority to direct habeas relief and to
order a new trial for the petitioner.

[1] See footnote 10 of the majority opinion.